IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 30, 2002

## IN THE MATTER OF: A.W. AND J.W., CHILDREN UNDER EIGHTEEN (18) YEARS OF AGE

Appeal from the Juvenile Court for Wilson County
No. 260 & 261     Barry Tatum, Judge

———————————

No. M2002-01665-COA-R3-JV - Filed February 11, 2003

———————————

The Juvenile Court of Wilson County terminated the parental rights of both parents to two young daughters. The mother appeals, asserting that the court erred in finding: (1) that the Department of Children's Services made reasonable efforts to reunite the family, (2) that she failed to substantially comply with the goals in the permanency plans, (3) that she failed to remedy the conditions that prevented the children's return to her, and (4) that the best interests of the children required the termination of her parental rights. We affirm the judgment of the juvenile court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM C. KOCH, JR. and WILLIAM B. CAIN, JJ., joined.

Debra L. Dishmon, Lebanon, Tennessee, for the appellant, T.W.

Paul G. Summers, Attorney General and Reporter; Elizabeth C. Driver, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.

The mother of A.W. and J.W. has a long history of mental illness and she and her husband lived a stormy life. In August of 1999 the mother was hospitalized for severe depression and psychotic features. The Department of Children's Services ("DCS") took custody of the children and found that their home was extremely dirty and unsuitable for the children. The hospital released the mother with a "guarded" prognosis after she was diagnosed with "Bipolar disorder, depressed, severe, recurrent, with psychotic features." The father's whereabouts were unknown at that time.

DCS developed a permanency plan for each child to be reunited with her mother. The mother agreed to several conditions in the plan, including taking her prescribed medications, taking parenting classes, maintaining a clean, stable home, and maintaining an adequate food supply.

Despite signing on to the reunification plan, the mother refused to acknowledge that she was ill and she refused to take her prescribed medications until shortly before the termination hearing. She was hospitalized involuntarily from January 26, 2000 through February 2, 2000. Her discharge summary identified a diagnosis of bi-polar disorder (severe) with a history of non-compliance with medications. The summary also revealed that her refusal to take her medication was under her belief that God had directed her not to do so.

The children bounced around in foster care, sometimes with relatives, but never in any one place for as long as a year. From July 2000 until the Spring of 2001 they lived with their half-sister under an order from the court. When the half-sister became ill she allowed the children to live with their mother for a month, but eventually concluded that that arrangement was not safe for the children. Consequently, the half-sister returned the children to DCS and they were placed in another foster home.

At a review hearing in September of 2001 the mother stated in open court that she would not take her medication because she did not need it. At that point the court directed DCS to file a parental termination petition as to both parents. In October of 2001, the Foster Care Review Board recommended proceeding with the termination hearing. DCS filed the petition on October 29, 2001 and only then, apparently, did the mother begin taking her medication. After the hearing the court made the following findings of fact:

- Mrs. [W.]'s Bi-polar condition is treatable with psychotropic medication.
- Since beginning a regimen of psychotropic medications in late October 2001 or early November 2001, Mrs. [W.]'s mental state has improved dramatically.
- At the time of the termination hearing, Mrs. [W.] testified that she is back to about 60% of normal. Much of this progress has occurred since early December 2001.
    . . . .
- Mrs. [W.] admits not realizing she was ill but attributed her condition to the stress placed on her by her husband, the girls' father.
- Mother admits talking to the girls about fasting as a profession of faith to God.
- Mrs. [W.] denies requiring the girls fast. Mrs. [W.] states that the girls "chose to fast".
- Mrs. [W.] at one point during her illness informally gave her girl's [sic] new names, "Soulful" and "Everessence" at the direction of God whose voice she had heard.
    . . . .

- Mrs. [W.] admits drinking alcohol to help her sleep even recently since taking the psychotropic medication.
- Mrs. [W.] admits consuming alcohol to help her sleep as recently as two nights prior to the termination of parental rights hearing.
  . . . .
- Mrs. [W.] admits that she is not cured and is still recovering at this point.
- Mrs. [W.] states she will take medication if that is what she has to do to keep [the] girls.
  . . . .
- Office notes from Mrs. [W.]'s therapist reflect that Mrs. [W.] prefers isolating herself in her home.
- Office notes from Mrs. [W.]'s therapist reflect that Mrs. [W] [has been] taking medication because this Court gave her an ultimatum, not because she was convinced she was mentally ill.
  . . . .
- Mrs. [W.]'s therapist states that Mrs. [W.] is still gradually accepting [the] fact that she has mental illness of Bi-polar. The therapist acknowledges Mrs. [W.] has still not fully accepted the diagnosis.
- Mrs. [W.]'s therapist confirms that Mrs. [W] or anyone on the medication she is taking should [n]ever drink alcohol.
  . . . .
- Dr. Sandy Phillips, Licensed Clinical psychologist, testified by evidentiary deposition on February 12, 2002. Dr. Phillips testified that Mrs. [W.] suffers from a chronic and severe mental illness. Dr. Phillips reports that Mrs. [W.] first saw a psychiatrist on October 24th, 2001. Dr. Phillips would not want anyone raising a child who is as severely ill as Mrs. [W.] unless that person was on medication. Dr. Phillips testified that Mrs. [W.]'s desire to continue taking medication is tied to her parental rights. Dr. Philips believes the best assurance that Mrs. [W.] will continue taking these medications would be to tie the custody to the compliance with medication. Per Dr. Phillips, Mrs. [W.] was aware that "they" wanted her to take the medication. Mrs. [W.] did not deem it necessary, as she did not view herself as ill. Dr. Phillips opines that alcohol consumption while taking this psychotropic medication is not advisable.

The court concluded that grounds existed for the termination of Mrs. W.'s parental rights and that the termination would be in the children's best interests.

## II.
### THE APPLICABLE LAW

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute. *Santosky v. Kramer*, 455 U.S. 745, 748 (1982); *In re: Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988); *Tennessee Department of Human Services v. Riley*, 689 S.W.2d 164, 165 (Tenn. Ct. App. 1984). In addition, all issues are premised on the foundation of "what is in the best interest of the child." *Riley*, 689 S.W.2d at 169.

In order to balance the rights of parents, and the best interests of children, the legislature has provided that parental rights may only be terminated for certain well-defined grounds. *See* Tenn. Code Ann. § 36-1-113(g). Two of those grounds are:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

The legislature requires that the grounds must be shown by clear and convincing evidence, Tenn. Code Ann. § 36-1-113(c)(1), and in addition that clear and convincing evidence must show that the termination is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c)(2).

## III.
### DID DCS PROVIDE REASONABLE SERVICES TO THE MOTHER?

The mother complains on appeal that DCS did not make reasonable efforts to help her make the changes in her circumstances that would allow the children to be returned to her. She cites Tenn. Code Ann. § 37-1-166(a), a code section dealing with foster care, that provides:

> (a) At any proceeding of a juvenile court, prior to ordering a child committed to or retained within the custody of the department of children's services, the court shall

first determine whether reasonable efforts have been made to:

(1) Prevent the need for removal of the child from such child's family; or
(2) Make it possible for the child to return home.

But as this court has noted a more pertinent statute is found in Tenn. Code Ann. § 36-1-113(i):

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
. . . .
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

*See Department of Children's Servs. v. Malone,* No. 03A01-9706-JV-00224, slip op. p. 1 (Tenn. Ct. App. Feb. 5, 1998)(quoting Tenn. Code Ann. § 36-1-113(h) which is now found at Tenn. Code Ann. § 36-1-113(i)).

We think the mother's argument misses the point. Of all the conditions existing in the home at the time the children were removed all but one had been substantially corrected with the help given her. The one remaining condition was the mother's mental illness that disabled her and made her home an unsafe place for her children. As unfortunate as her condition is, it can be treated with medication; but until she finally faced a termination petition, the mother steadfastly refused to honor her promise to take her medication. We are unsure what additional services short of confinement, DCS could have supplied that would have helped the mother take her medication. She has not suggested any. Therefore, we do not think DCS failed to make reasonable efforts to help the mother make the "lasting adjustment" that is required to avoid the termination of her parental rights.

## IV.
### IS THE EVIDENCE CLEAR AND CONVINCING THAT THE MOTHER FAILED TO COMPLY WITH THE PERMANENCY PLANS?

There can be no doubt that the mother failed to take her medication, perhaps the key to the whole ocean of troubles that led to the removal of her children from her care. As late as September 28, 2001, the mother stated in open court that she did not need and would not take the medication prescribed for her mental illness.

Her answer to this irrefutable finding by the trial judge is twofold. First, she argues that the permanency plans are nullities because they were not approved by the court in a timely fashion. Tenn. Code Ann. § 37-2-403 directs the juvenile court to ratify a permanency plan within sixty days if a child is placed in foster care. The court in this case did not meet that deadline, but as we have said in prior cases, these requirements are directory and not mandatory. *See In re: T.F.*, No. W2001-

01935-COA-R3-JV, slip op. at 7-8 (Tenn. Ct. App. Feb. 19, 2002). The mother does not argue that she was unaware of the conditions placed on her or that she thought the plans had lapsed. She was at all pertinent times represented by counsel, and she did not object to the continuing applicability of the plans. Therefore, we do not think she can escape the conditions placed on her on this basis.

Secondly, the mother argues that by the time of the trial she had substantially complied with all the requirements of the plans. The court acknowledged that since she began taking her medication she had returned to about sixty percent of normal. The court called this a "dramatic improvement." But the court also concluded that the improvement came "Too little, too late."

As to the "too little" conclusion, we concur. The mother is not well. Her therapist testified that the mother is only gradually accepting the fact that she is mentally ill, and that she began taking her medication because the court gave her an ultimatum, not because she believed she needed it. The therapist also testified that consuming alcohol along with psychotropic medicines is not advisable. Therefore, returning the children to the mother's custody could not be ordered at this time, and there is no way to predict that the mother will ever fully accept the fact that she needs to take the responsibility for herself and her children.

As to the "too late" conclusion, we also concur. In *State v. Pruitt*, No. M2000-00416-COA-R3-CV (Tenn. Ct. App. June 27, 2000), we were confronted with a mother who refused to take her medication until two months before the trial. Although the medication helped her mental condition, the court held that nothing in the statutes or the common law required the court to defer a decision so that the mother could have more time to demonstrate that her improvement was permanent. The child in that case had spent the most recent year and a half in foster care. In all, he had spent over half of his life in and out of foster care. In this case the children stayed in foster care a little over two years before the court, on hearing the mother say another time that she would not take her medicine, directed DCS to file the termination petition. We think the court gave the mother an adequate chance to comply with the permanency plans.

## V.
### IS THE CONCLUSION THAT TERMINATION IS IN THE BEST INTERESTS OF THE CHILDREN SUPPORTED BY CLEAR AND CONVINCING EVIDENCE?

Some of the factors to be considered in determining if termination of a parent's rights is in the child's best interests are found in Tenn. Code Ann. § 36-1-113(i):

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

-6-

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

. . . .

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child;

In this case the trial judge found the following:

I find the girls' reference to Mrs. [W.] as "[T.]" significant. This implies the relationship that exists is not necessarily a maternal relationship but is one of mere friendship. Dr. Phillips even testified that an assessment of Mrs. [W.]'s parenting skills today is not feasible. Mrs. [W.] has had actual physical custody of these girls for only a few weeks in the past two and one half years. Dr. Phillips opines that there is no accurate way to fully assess a parent's skill when that person has not been capable of being a parent for essentially a two year period.

On the other hand, the record is clear that Mrs. [W.] has had over two and one-half years to effect a lasting change in her life through mental health treatment and medication. Mrs. [W.] has wasted that opportunity. Only now in the past few weeks has she even begun to do what she was directed to do in September 1999....

. . . .

These girls have had eight different homes since August 1999 according to Mrs. Smith, the foster parent. According to Mrs. Smith after the February birthday visit, [A.] cried for days saying over and over again "too many homes". A. has expressed dismay and frustration with her extended family for not taking them in so they can continue seeing their mother.

In my view, these children need a break. They have been bounced from one home to another and have suffered enough. Their Mother has had ample time to get her illness under control and wasted that opportunity. Even now, if Mrs. [W.] were given another six months to demonstrate she can maintain her treatment and

medication, these girls would still be facing a transition period back to their Mother that is subject to failure at any time.

These girls need and deserve the stability, security and continuity that an adoptive home can provide.

Accordingly, I find by clear and convincing proof that the best interest of these girls requires that all of the parental rights of Respondents to these children be forever terminated, and that the complete custody, control and guardianship of [A.W.] and [J.W.], be awarded to the State of Tennessee, Department of Children's Services, with the right to place them for adoption and to consent to such adoption in loco parentis.

We think the findings of the trial judge – which are not refuted – are clear and convincing proof that the best interests of these children will be served by terminating the mother's parental rights. Only then will they have a chance to escape the revolving door of foster care and to be placed in a permanent and stable home.

We affirm the judgment of the court below and remand this cause to the Juvenile Court of Wilson County for any further proceedings necessary. Tax the costs on appeal to the appellant, T.W.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.