# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 7, 2004 Session

## IN RE: A.M.T., Z.T.R., AND K.W.T.

**Appeal from the Juvenile Court for Davidson County**
**No. 22-72605, 2019-57602, 2019-53684, 2219-70163    Betty Adams Green, Judge**

---

**No. M2003-02926-COA-R3-PT - Filed July 2, 2004**

---

Two children were placed in the custody of the Department of Children's Services because of the mother's inability to provide stable and sanitary housing. The Department established permanency plans whereby the mother would obtain and maintain stable and sanitary housing, pay child support, attend parenting classes, work with Homemaker Services to learn how to keep the home clean, obtain a parenting assessment, and undergo counseling for her mental health issues. A third child was born while the mother's other two children were in the Department's custody. This child was born prematurely and required extensive hospitalization and was also placed in the Department's custody. The Department filed a petition to terminate the mother's parental rights as to all three children, which the juvenile court granted on the grounds of abandonment due to failure to pay child support, failing to comply with the permanency plans and persistent conditions. We reverse the juvenile court's finding of abandonment, but affirm the termination of parental rights based on persistent conditions and failure to comply with the permanency plan. We also affirm the juvenile court's finding that termination of the mother's parental rights is in the best interests of the children.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in Part

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., joined. WILLIAM B. CAIN, J., filed a concurring opinion.

Nick Perenich, Nashville, Tennessee, for the appellant, K.L.T., the mother.

Paul G. Summers, Attorney General and Reporter; and Elizabeth C. Driver, Office of the Attorney General, for the appellee, Tennessee Department of Children's Services

Thomas H. Miller, Nashville, Tennessee, guardian ad litem.

**OPINION**

This is an appeal of the termination of the mother's parental rights to her three children, A.M.T., Z.T.R. and K.W.T. Mother appeals and presents four issues for review. First, did the trial court err when it found that the mother abandoned her children pursuant to Tenn. Code Ann. § 36-1-113(g)(1)? Second, did the court err by finding that the mother was in substantial non-compliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2)? Third, did the trial court err when it found that grounds exist under Tenn. Code Ann.§ 36-1-113(g)(3), commonly identified as persistent conditions, to terminate the mother's parental rights? Fourth, was termination of the mother's parental rights in the best interests of the children?

Procedural History and Facts

In July 2000 K.L.T. (Mother) placed her two children[1] in the Madison Children's Home because of complications from a pregnancy that required medication and bed rest. At the time she was staying at the Salvation Army and unable to work. The Children's Home was concerned that Mother was emotionally unstable and unable to keep the children clean or to properly supervise them. In September of 2000, the Children's Home petitioned for emergency custody of the children and the children were appointed a guardian ad litem.

Legal custody of the two children remained with Mother while the children remained in the physical custody of the Children's Home until the birth of the expected child. The expected child was placed for adoption with a family who had adopted one of Mother's other children. During this time, the Department agreed to provide services to Mother and a plan of action was developed that required Mother to find permanent housing, permanent employment, obtain a mental health assessment and complete parenting classes. Based on Mother's agreement to accomplish these tasks, the Children's Home withdrew its petition in November of 2000, and the children returned to Mother's care.

However, in April 2001, the Department filed a dependency-neglect petition against Mother alleging that the living conditions in the home were a threat to the children's health and safety. The home was described as very dirty and cluttered with so much trash in the rooms that access to the home was severely restricted. The petition alleged that food was unrefrigerated, dirty dishes and uneaten food littered the apartment and that the home was filled with a heavy and unpleasant odor. One bedroom was alleged to be uninhabitable. Mother agreed to place the children with a friend and thus the Department did not seek custody at that time.

By July of 2001, Mother was facing eviction from her apartment and even though she had adequate income, she had no plan to provide stable housing. In addition, the friend who had cared

---

[1] At the time of this placement Mother was pregnant with a child, who was adopted by a third party shortly after birth and with the consent of Mother. Over the course of these proceedings she became pregnant again and gave birth to a child, K.W.T., who is also the subject of these proceedings.

for the children was no longer able to care for them.  As a result, the Department obtained custody of the children by emergency removal, and Mother agreed there was probable cause to justify the removal and that the allegations in the petition could be sustained.

Permanency plans were approved by the court which required Mother to:

1.    Find and maintain stable housing for a period longer than two or three months.
2.    Cooperate with Homemaker services and demonstrate an ability to maintain some level of cleanliness in the home and an ability to budget.
3.    Pay child support in the amount the court determines[2].
4.    Spend at least 4 hours per month visiting with the children.
5.    Cooperate with the counselor and follow recommendations of the counselor.
6.    Identify issues that are barriers to permanency by undergoing a parenting assessment.

The Foster Care Review Board noted in February 2002 that visiting the children was the only task in the permanency plan that Mother was satisfying. The board also noted that Mother revoked her release to the Department, denying the Department access to her psychological records.

On March 7, 2002 the juvenile court found the two older children to be dependent and neglected based upon an agreed order between the Department and Mother.  In pertinent part, the agreed order provided that the following facts were supported by clear and convincing evidence:

1.    The Department of Children's Services has been involved with the mother since June, 2000 as a result of the mother's inability to maintain a safe and sanitary living environment for her children.

2.    Although the Department had offered the mother intensive services and the children had been returned to her home, by March 2001, the conditions in the home had once again deteriorated to an unsanitary state.

3.    Again, Homemaker Services were offered to assist the mother with cleanliness and budgeting issues.

4.    Despite her insistence that she had steady employment, the mother failed to cooperate with the Department, failed to provide accurate information regarding a pending eviction, and has generally failed to maintain a stable, safe and sanitary home environment for the children.  As a result, the children were removed into State custody on July 5, 2001.

On July 11, 2002, the juvenile court entered a permanency hearing order in which it found that the children had been in the custody of the Department since July 5, 2001, yet Mother had done

_____

[2] On August 20, 2001, Mother was ordered to pay $50 per month in child support.

-3-

nothing to satisfy the plan requirements of stable housing, or the other tasks set forth in the parenting plan. A revised plan was approved on July 11, 2002, this time increasing the stable housing requirement to six months. The Department stated that it had the concurrent goals of returning the children to Mother and adoption.

In the midst of these difficulties, Mother gave birth to another child on January 1, 2002, who became the subject of these proceedings. Born premature, this child, K.W.T., was hospitalized until August of 2002. This child, as described by his neonatologist, has had an "extremely lengthy, and complex medical course." The doctor further described the child as "ventilator dependent for 100+ days and at one point, was considered terminal." As a result of the dependency on the ventilator and prematurity, the doctor opined that the child had extensive lung damage and will need supplemental oxygen therapy for an "undeterminable length of time." The doctor further stated that the child's medical needs after discharge from the hospital would be extensive, that the child would be at high risk of respiratory and bloodstream infections with potentially severe consequences and that the child's prognosis was "extremely guarded."

Because of this child's extensive medical needs and the fact that Mother had not complied with most of the requirements of the permanency plans for the other two children, the Department filed a petition for custody and emergency removal upon his release from the hospital. The petition further indicated that Mother had no permanent address and that Mother stated that she would be moving to a new home in August of 2002. On August 19, 2002 the juvenile court entered an emergency protective custody order placing the child in the custody of the Department.

A permanency plan was developed for the infant, which was similar in its requirements to the plans for her other two children, but it further provided that Mother would need to participate and demonstrate the medical skills needed to handle the infant's medical condition. On October 11, 2002, the juvenile court adopted the permanency plan for the infant, and noted that Mother was still failing to substantially comply with the permanency plans for her other two children.

On January 9, 2003, the Department filed its petition to terminate Mother's parental rights. After the trial, which took place over two days, June 9 and July 28, 2003, the juvenile court terminated Mother's parental rights on three of the grounds for termination found in Tenn. Code Ann.§ 36-1-113(g). First, the court found that she willfully failed to support the children pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and §36-1-102(1)(A). The court noted that with the exception of the first payment, every payment was made after the filing of the petition and that the support that Mother did pay was token. The court further noted that while it did not base its finding of abandonment on failure to visit, it "seriously questioned" whether Mother's efforts in this regard were also token, pointing out that Mother was "inconsistent and erratic" in visiting the children and that when she missed visiting the children on Christmas, she did not request a makeup visit.

Second, the juvenile court found substantial noncompliance with the permanency plans pursuant to Tenn. Code Ann.§ 36-1-113(g)(2). Pertinently the court stated, "When the goal is return to parent, permanency plans are blueprints for returning children to parents. [Mother] ignored the

-4-

core requirements of the plans: maintaining stable, sanitary housing, demonstrating budgeting skills and addressing her issues in a therapeutic setting."

Third, the juvenile court found grounds for termination pursuant to Tenn. Code Ann. § 36-1-113(g)(3), commonly referred to as "persistent conditions." The court stated:

> As previously noted, the mother has changed residences at least 13 times since [A.M.T.]and [Z.T.R] have been removed, and she has not demonstrated that she has acquired an ability to keep her home clean. She acknowledges that moving every three or four months is a coping mechanism for her. She has paid only token child support. She has not engaged in meaningfully, therapeutic counseling to address her own issues of physical and sexual abuse; indeed, her persistent failure to do so makes it clear that she is not going to confront those demons from her past.

The juvenile court further found that pursuant to Tenn. Code Ann. § 36-1-113(i) termination of Mother's parental rights was in the children's best interests and based its decision on nine factors.

## Standard of Review in Termination Cases

Proceedings to terminate parental rights are statutory. Parties seeking to terminate a parent's rights with regard to his or her child must prove two things. They must prove the existence of at least one statutory ground for termination.[3] Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Additionally, they must prove that terminating the parent's rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(2); *In re A.W.*, 114 S.W.3d 541, 545 (Tenn. Ct. App. 2003); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). The factors to be considered in a "best interests" analysis are set forth in Tenn. Code Ann. § 36-1-113(i).

Persons seeking to terminate these rights must prove the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re A.W.*, 114 S.W.3d at 545. Evidence that satisfies the clear and convincing evidence standard eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *Walton v. Young*, 950 S.W.2d 956, 960 (Tenn. 1997); *In re C.D.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the propositions sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000).

As a consequence of the clear and convincing burden of proof standard, this Court found it necessary to adapt Tenn. R. App. P. 13(d). *In Re Adoption of Muir*, No. 2002-02963-COA-R3-CV, 2003 WL 22794524, *2 (Tenn. Ct. App. Nov. 25, 2003) explained the adaptation in detail.

---

[3] The statutory grounds for terminating parental rights are found in Tenn. Code Ann. § 36-1-113(g).

Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-1139(c), we must adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the grounds for terminating the biological parent's parental rights. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 546; *Ray v. Ray*, 83 S.W.3d at 733; *In re L.S.W.*, No. M2000-01935-COA-R3-JV, 2001 WL 1013079, at *5 (Tenn. Ct. App. Sept. 6, 2001), *perm. app. denied* (Tenn. Dec. 27, 2001).[4]

*In Re Adoption of Muir*, at *2 .

## Abandonment

Mother argues that while her payment of support was not perfect, the Department did not show by clear and convincing evidence that she intended to abandon her children by failing to support them. As an example, she asserts that she paid $71.69 for medical insurance and $15.12 for dental insurance every two weeks while the children were in custody from October, 2001 through November 2002. Further, Mother argues that she was confused about the amount to pay and the process of payment through wage assignment. Mother asserts that the caseworker, Shatina Byers, did not discuss child support payments with her. Mother also contends that she brought gifts and clothing to the children and that she moved into and furnished a larger trailer in anticipation of the children's return home.

The Department asserts that beginning in August of 2001 Mother was under an order to pay $50.00 in child support for the children in the Department's custody and that Mother was aware of this obligation. Further, the Department argues that the obligation to pay child support was also part of the permanency plans.

According to the Department, Mother's testimony indicates that she was employed at numerous jobs while the children were in the Department's custody. However, the Department asserts that she only paid $150.00 in child support in the seventeen month period that elapsed between the order requiring support and the filing of the petition to terminate Mother's parental

---

[4]These decisions draw a distinction between specific facts and the combined weight of these facts. Tenn. R. App. P. 13(d) requires us to defer to the trial court's specific findings of fact as long as they are supported by a preponderance of the evidence. However, we must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion. The Tennessee Supreme Court used this approach in *In Re Valentine* when it recognized the difference between the conclusion that a biological parent had not complied substantially with her obligations in a permanency plan and the facts relied upon by the trial court in support of this conclusion. *In Re Valentine*, 79 S.W.3d at 548-49; *see also Jones v. Garrett*, 92 S.W.3d at 838.

rights. The Department further points out that Mother paid no support in the four months prior to the filing of the petition.

The guardian ad litem, Thomas Miller, asserts that "the record does not show clearly and convincingly that Mother's support was insignificant given her means or that she willfully failed to support her children" and that the juvenile court's finding of abandonment should be reversed. The guardian ad litem contends that while it is undisputed that Mother knew of her obligation to support the children, the four-month period at issue under the statute would run from September 2002 through December 2002 and that the record does not indicate Mother's income during this time period even though she appears to have been consistently employed and that income during other periods was established. Further, the guardian ad litem asserts that Mother's testimony that she paid medical and dental insurance for the children is uncontroverted. Moreover, there was also proof of an Internal Revenue Service intercept in the amount of $700.00 which was for child support.

For purposes of terminating the parental rights of a parent, "abandonment" means:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann.§ 36-1-102(1)(A)(i).

The statute further provides that "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means, Tenn. Code Ann.§ 36-1-102(B), and that "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child. Tenn. Code Ann.§ 36-1-102(D).

The concept of "willfulness" is at the core of the statutory definition of abandonment. *In re Adoption of Muir* at *4. A parent cannot be found to have abandoned a child unless the parent either has "willfully" failed to engage in more than token visitation or has "willfully" failed to provide more than token monetary support to the child for four consecutive months. *Id.* at *4. *In re Adoption of Muir* further explains that,

> "Willfulness" does not require the same standard of culpability required by the penal code. (citation omitted). Nor does it require malevolence or ill will. (citation omitted). Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. (citation omitted).

-7-

Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

Failure to support a child is "willful" when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support. (citation omitted).

*Id.* at *4-5.

Critical to the determination of abandonment under Tenn. Code Ann.§ 36-1-102(1)(A)(i) is the four month period "immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s)." In this case, the petition to terminate Mother's parental rights was filed on January 9, 2003 so the relevant period extends back four months from this date. During this time, Mother presented testimony which was uncontroverted, that she paid for medical and dental insurance for the children in the respective amounts of $71.69 and $15.12 every two weeks until November of 2002. Given Mother's typically modest level of income, we find that these payments are not insignificant. Further, since the record does not contain evidence of Mother's income and expenses during this four-month time period, the evidence is therefore insufficient to conclude under the clear and convincing standard that Mother had the means and willfully failed to support her children. Thus, we reverse the trial court on the issue of abandonment.

Permanency Plan

Mother denies that she failed to substantially comply with the permanency plans. She argues that the juvenile court is incorrect in its finding that she "ignored the core requirements of the plans: maintaining stable, sanitary housing, demonstrating budgeting skills and addressing her issues in a therapeutic setting." She asserts that the Department ignored her when she did move into stable housing and did not check whether the housing was being kept clean. Mother asserts that the Department is using her move to better housing against her and that in spite of the failure of the Department to help her she has gotten help from friends on budgeting and from the Mental Health Co-Op with respect to her mental health issues and also assistance with budgeting.

The Department argues that the permanency plan requirements were "reasonable and related to remedying the conditions which necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C); *In Re Valentine*, 79 S. W. 2d 3d 539, 547 (Tenn. 2002). The Department maintains that Mother failed to comply with even the most basic requirements of the plans. The Department points to specific instances of non-compliance which it contends are substantial, such as the fact that she did not stay in the same housing for more than two or three months, that the conditions in the housing were deplorable, and that clean and stable housing was a critical issue to remedy. Moreover, on second day of trial, she was moving again, and as of that date had no housing, had quit her previous job and was working for a day-labor company. Maintaining stable housing, is critical, the

Department contends, because without stable housing, the requirement of getting assistance through Homemaker Services is impossible. Further, the Department argues that while Mother did learn a great deal about the care her sick child, K.W.T., would require, caring for the child would be impossible without stable and clean housing.

The guardian ad litem agrees with the juvenile court's ruling that Mother failed to comply with the core requirements of the plan and that because the core requirements are entitled to great weight in the court's analysis, the court's ruling should stand.

The framework for our analysis of this ground is set forth in *In re Valentine*. First,

> A trial court must find that the requirements of a permanency plan are "reasonable and related to remedying the conditions which necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C). We hold that this finding must be made in conjunction with the determination of substantial noncompliance under § 36-1-113(g)(2).

*In re Valentine,* 79 S.W.3d 539, 547 (Tenn. 2002). Second, we must consider what constitutes substantial noncompliance and the effect of the failure to comply.

> Substantial noncompliance is a question of law which we review de novo with no presumption of correctness. Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." *Black's Law Dictionary* 1428 (6th ed.1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement. Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant.

*Id.* at 548-549 (Tenn. 2002).

The juvenile court found that the requirements of the plan were "reasonable and related to remedying the conditions" which caused the placement in foster care and this finding was made in conjunction with the determination of substantial noncompliance. Our review of the record confirms that the requirements were reasonable, practical and highly relevant to resolving the issues that caused the children to be placed in the Department's custody.

Mother's failure to comply with the plans rose to the level of substantial noncompliance. While Mother testified at great length and in detail about how she partially complied, that no one provided assistance so that she could comply, and how conflicts with her Department caseworker prevented her from complying; there is nothing in the record to support these claims. Moreover,

there is nothing in the record to show that she asked for further assistance or complained of the alleged deficiencies of Department personnel. Absent supporting proof in this regard, we find Mother's excuses for noncompliance insufficient, especially in light of the length of time that she had to comply.

We also note from Mother's testimony that between the trial dates of June 9, 2003 and July 28, 2003 she made some progress with some of the requirements, such as obtaining parenting classes and getting help with her mental health issues. However, the juvenile court had doubts, as do we, as to the content and sufficiency of the classes. Ironically, the successes Mother claims to have achieved, which appear to be inadequate, are a mixed bag for Mother because they prove that the efforts Mother made after the trial began could have and should have been made in the two years preceding the trial. The juvenile court characterized these efforts as "too little, too late." We agree and, thus, are not persuaded that this last minute burst of activity is indicative of a long-term commitment on Mother's part to resolve the issues which led to the involvement of the Department.

Mother also presented testimony on the second day of trial which did little but underscore her deficiencies. For example, on the first day of trial, she testified that she had lived at her current address for ten months, yet on the second day of trial she testified that she had moved, yet again. She claimed she did this so that her children would benefit from better living conditions; however, on cross-examination, it was revealed that Mother was merely in the process of moving, had left her previous residence and had no housing for the children. To further negate any alleged benefit from this relocation, Mother claimed this move as an explanation for her inability to pay child support.

We view these changes between the trial dates as consistent with Mother's testimony during the first day of trial when she said, "[I]f I've lived somewhere more than about two and-a-half months, usually about three months is my stay time mostly just because I move so much and I - - it just doesn't feel right." In sum, we view Mother's last minute efforts to comply with the permanency plans as more evidence of Mother's habitually inadequate efforts and bad decisions.

### Persistence of Conditions

Mother argues that she should have been given more credit for her efforts at compliance, that the court incorrectly characterized her efforts as "too little, too late," and that the Department's failure to provide her with services or check on her improvements should not be held against her. Further, she argues that Dr. Berryman, who performed the parenting assessment, testified that Mother could improve herself within a short period of time.

The Department asserts that there is no dispute that the children have been in its custody for more than six months and that Mother has failed to remedy the conditions which brought about the children's removal from the home. The Department argues that Mother has still not participated in long-term consistent therapy, has failed to maintain stable housing and employment and that Mother's failure to remedy these conditions in three years is clear and convincing evidence that she will not remedy the conditions at an early date as required by the statute. Further, the Department

contends that it is detrimental to keep the children in foster care any longer and that doing so will work to prevent their integration into a safe and permanent family.

The guardian ad litem contends the main reason that the children were removed was lack of stable housing and that this condition still exists as well as the fact that Mother has failed to resolve her untreated abuse issues, exposing the children to further abuse or neglect if they are returned.

In terminating Mother's parental rights on this ground, the juvenile court stated:

[T]he mother has changed residences at least 13 times since [A.M.T.] and [Z.T.R.] have been removed, and she has not demonstrated that she has acquired an ability to keep her home clean. She acknowledges that moving every three or four months is a coping mechanism for her. She has paid only token child support. She has not engaged in meaningfully, therapeutic counseling to address her own issues of physical and sexual abuse; indeed, her persistent failure to do so makes it clear that she is not going to confront those demons from her past.

Last minute efforts of a parent were examined by this court in *In the Matter of A.W. and J.W*, 114 S.W. 3d 541 (Tenn. Ct. App. 2003). In that matter, the mother, who had been diagnosed with bi-polar disorder, repeatedly refused to take her medication until after the petition to terminate was filed, which was some two years after the children were placed in foster care. In that case, the trial court found that the mother made a dramatic improvement after the petition to terminate her rights was filed but concluded that the improvement was "too little, too late." *Id*. at 547. As to the "too little" conclusion, this court concurred finding that the mother began taking her medication, not because she believed she needed the medication but because she had been given an ultimatum. As to the "too late" conclusion, this court again concurred finding it was confronted with a mother who had repeatedly told the Department over two years that she would not take her medicine. Based on the above facts, this court concluded that the trial court gave the mother an adequate chance to comply, that the mother failed to do so and the termination of her rights was affirmed. *Id.* at 546-547.

The statute provides for termination when the child has been removed from the home of the parent by order of a court for a period of six (6) months and

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. §36-1-113(g)(3)(A).

There is ample evidence in the record to terminate Mother's parental rights on this ground. First, the children came into the Department's custody on July 5, 2000 giving Mother almost 20 months prior to the filing of the petition to terminate to resolve the issues that have prevented the children's return to her. Mother has done little to make these changes to comply with the Department's requirements. While she has made numerous allegations against the Department, nothing in the record shows any documentation as to these complaints, let alone any action on her part to resolve these differences with the Department. However, while Mother has testified that she cannot get along with her caseworker, she is able to communicate through the caseworker's supervisor. What the record does show is that Mother has consistently and persistently failed to resolve the fundamental issues which prevent the return of her children and the existence of which would put the children at risk for further abuse and neglect if they were be to returned to her.

Our review of Mother's testimony convinces us that she is reasonably intelligent, yet she repeatedly failed to take the necessary steps which would lead to the return of her children. In reviewing the record, we are struck by her testimony on the first day of trial about how hard she had worked to prepare the home for the children's return and how she had a network of support to assist with the children's return and especially how this support network would help her care for her children. Yet incredibly, on the second day of trial, less than two months later, she did not have housing, at least she cannot prove that she had more than an expectation of housing, and had again changed employment. Despite, Mother's positive characterization of this turn of events, it is apparent that Mother had not bettered her situation. Given the length of time the children have been in the Department's custody and the lack of progress made by Mother to comply with the requirements, we find that the evidence is clear and convincing that the inadequate conditions will persist and that maintaining the parent child relationship any longer greatly diminishes the children's chances of early integration into a safe, stable and permanent home.

We also note that while her prematurely born child has not been in the Department's custody for the same length of time as her other two children, the record is compelling that this child has extensive medical needs, is very susceptible to infection, and requires almost around the clock care. Elaine Fink, his foster parent, who has twenty-two years of nursing experience, testified that K.W.T is the only child in her home and that he is a "full-time, first in your life kind of job or person in your home" who must be checked on every few minutes. Ms. Fink further testified that caring for K.W.T. is a "full day all the time" challenge and that she could not hold a job and care for K.W.T. This child's medical condition and needs, coupled with Mother's habitual inability to provide the basic care needed by physically healthy children, supports the termination of Mother's rights although this child has not been in the Department's custody as long as her other children.

<u>Best Interests of the Children</u>

The juvenile court found that termination of Mother's parental rights was in the children's best interests, based on nine reasons. An examination of each follows:

1.   The mother has failed to make such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in the home of the mother.

Mother contends that the Department did not provide testimony concerning the children's safety in the home or the adjustments Mother made. She further contends that Dr. Berryman reported that Mother had "adequate parenting knowledge and gives very appropriate answers to scenarios in which parenting skills are assessed" and that Dr. Berryman testified that Mother "seems to care very much for her children."

The record reveals that Mother's housing was habitually unstable and unsafe for the children. She admitted that she felt compelled to move every two to three months and moved 13 times while the children were in the Department's custody. Ironically and irresponsibly, between the trial dates she abandoned the best housing she had obtained and was basically homeless with little more than an expectation of suitable housing on the second day of trial. Moreover, she persistently avoided mental health treatment that could have been instrumental in providing a safe and stable home for the children.

2.   The mother has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible.

Mother contends that reasonable efforts were not made by the Department and that the caseworker erroneously thought she was relieved of her duties. Further, Mother asserts that she did in fact obtain stable housing and that the caseworker did not even visit Mother's "improved" housing.

The record shows that Mother experienced conflict with her caseworker, Ms. Byers; however, it also shows that she had an excellent relationship and regular contact with the caseworker's supervisor, Ms. Goodwin. Whatever difficulties or conflicts may have existed, Mother had ample time to resolve these issues and/or seek relief from the court, yet there is no evidence of any efforts by Mother to resolve her difficulties with her caseworker other than communicating directly with the supervisor. Mother moved often which impaired the Department's ability to assist her. Addie DeGraphenreed with Homemaker Services testified that at the request of the Department her agency attempted to provide services to Mother and that even though Mother was always given notice of the next appointment there were so many no-shows by Mother that the agency closed its file. Ms. Degraphenreed further testified that Mother's file with Homemaker Services was closed and

re-opened at least twice due to Mother's history of "no-shows," cancelled appointments, and unannounced moves to different housing.[5]

    3.      A change of caretakers and physical environment would likely have an adverse affect on the children's emotional and psychological condition.

Mother argues that the evidence showed that the children love their mother, are bonded to her, and that there was no proof that returning the children to her would cause them harm.

Joyce Briehof, who served as a foster parent for two of the children testified that on the first day the children arrived one child threw 23 tantrums in one day and through consistent discipline, diagnosis and proper medication this child has improved significantly. The other child who was quiet and withdrawn was diagnosed with Attention Deficit Hyperactivity Disorder and is now receiving medication. Ms. Briehof testified that this child was severely deficient in reading skills but that through consistent efforts to shore up these weaknesses he has made A's and B's and the honor roll twice. At trial Ms. Briehof was asked, "How important do you think stability is to them [the children]?" To which she replied, "Extremely with these children. I've always been that type personality. I eat dinner at the same time every day. You know, you go to bed at the same time. That is probably the one thing that has made these children improve so much is the consistency of our routine."

    4.      The mother neglected the children while they were in her care.

Mother does not dispute that the children were neglected, but argues that there was no finding of neglect as to her prematurely born child.

While her prematurely born child may not have been neglected, the child was never in Mother's care because the Department obtained custody upon the child's release from the hospital. The Department's petition for emergency removal was granted based on the child's very serious medical condition, the previous history of neglect with respect to Mother's other two children, and Mother's failure to resolve requirements of the permanency plans.

    5.      The mother's mental and/or emotional status would be detrimental to the children and would prevent the mother from effectively providing safe and stable care and supervision for the children. She has significant mental health disorders for which she refuses treatment.

Mother principally argues that she had completed a fifteen hour parenting class, attended individual therapy and had made an appointment for a psychiatric evaluation.

---

[5]The record reveals that on one occasion the landlord was observed padlocking the door because Mother had failed to pay rent.

Dr. Berryman described Mother's prognosis as guarded and stated that some improvement could be expected, but that improvement was based on Mother participating in therapy. Dr. Berryman testified that Mother did not follow through to complete her assessment and that she appeared "resigned and unhappy" when individual counseling and parenting classes were recommended. The record also reveals that Mother had many excuses as to why she could not attend therapy for almost two years but ironically she claims to have made progress between trial dates, though this so-called progress was unsubstantiated.

6.      The mother has not paid child support consistent with the child support guidelines promulgated by DCS pursuant to T.C.A. § 36-5-101.

Mother acknowledges that the juvenile court is correct on this point, but she argues that the court should have taken into account the fact that the referee allowed Mother to deviate from the guidelines and that Mother provided insurance for her children.

While the Department failed to prove that Mother willfully failed to support the children, as discussed earlier, her failure to support, willful or not, is relevant as a best interest factor. Though the evidence was insufficient to show willfulness, Mother's testimony as to why she had made nothing more than a superficial attempt to support her sick child is indicative of her immaturity and irresponsibility. Another tragic irony in this case is that the alleged beneficial changes Mother made between the two trial dates, which were purportedly to better herself for the benefit of her children, were used by Mother as an excuse for why she stopped paying support for A.M.T. and Z.T.R.

7.      The mother has not demonstrated that she has acquired the skills to maintain a clean and healthy living environment for the children.

Mother contends that a caseworker did visit the home and found no problem with cleanliness, and that the Department's failure to further inspect the home should not be held against her.

While a caseworker did visit Mother's home on June 2, 2003, and found it to be sanitary, Mother inexplicably abandoned that residence and had no housing by the second day of trial. She had little more than the expectation of obtaining public housing in Columbia, Tennessee.

Ms. Byers, Mother's caseworker, was asked:

Q.      One final question. Given all the information you have, which includes your experience working with [Mother], the testimony you've heard from Dr. Berryman and her report, and the past history that you know about [Mother], if she had - - if her home today was just clean, well furnished, perfect, ready for a Barbara Walter's special, would you have concerns that two or three months from now it might go back to the way things were when the children came into care?

A.      Yes, I would.

Q.    And why would you be concerned about that?

A.    From working the case, even when she was at some of the other addresses, like the Dickerson Road address, there were problems that were reported to me that she didn't keep the trailer as clean as she should and she had only been there a few weeks and she was there by herself. And Mr. – the guy that she lived with in Ashland City, when I spoke with him, he informed me that his issues with [Mother], their arguments stemmed from her not wanting to clean up behind herself and those type issues. So I do have a concern that, you know, she may clean it up initially to get things the way we would like to see it and then it'll go back to the situation.

8.    The mother has not demonstrated that she has acquired budgeting skills sufficient to enable her to adequately care for her children.

Mother argues that she had learned budgeting skills from a friend and from the Mental Health Co-op, and that she had furnished a trailer for the children's return.

While Mother testified that she had allegedly learned budgeting skills from a friend and from classes at the Mental Health Co-op, no one testified to corroborate her testimony. Moreover, this claimed enhancement of skills was contradicted by her latest ill-advised efforts to obtain different housing. All she accomplished from that effort was the loss of the most suitable housing she had obtained in years and, ironically, yet another excuse for not paying child support. If she attended classes and received budgeting advice from a friend, it is apparent she failed to apply what she learned.

9.    K.W.T. continues to need intensive, round-the-clock care by a trained professional. The mother does not possess those skills, and, even if she acquired them, she could not provide the constant care K.W.T. requires while adequately caring for A.M.T. and Z.T.R.

Mother argues that this finding is egregious because any single mother with three children, and one of them very ill, would be unable to parent. She argues that she demonstrated that she was learning what was required to care for the sick child and was preparing for his return.

While we acknowledge that she testified impressively and passionately about her sick child's medical history and needs, the record is convincing that Mother had not cared for this child and had habitually failed to properly care her other two children. What is evident is that Mother is reasonably intelligent, however, due to her inability to correct fundamental deficiencies in care giving, the information she learned regarding K.W.T.'s needs has limited, if any, benefit for she has demonstrated that she cannot provide appropriate care for her family on a sustained basis. Recognizing her sick child's medical needs and fragile health, it would be ludicrous to believe that she would render the required care on a sustained basis.

Having reviewed all nine factors found by the juvenile court, we find clear and convincing evidence that termination of Mother's parental rights are in the best interests of all three children.

Therefore, we reverse the juvenile court's finding of abandonment, but affirm the termination of Mother's parental rights on all other grounds.

Costs of appeal are assessed against Mother.

_____
FRANK G. CLEMENT, JR., JUDGE