FILED

02/08/2019

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 3, 2018

**IN RE SERENITY W.**

**Appeal from the Juvenile Court for Cocke County**
**No. TPR-05451      Steven Lane Wolfenbarger, Judge**

_____

**No. E2018-00460-COA-R3-PT**
_____

Charles D. Susano, Jr., J., concurring in part and dissenting in part.

The majority holds, in its own words, that

> the evidence was less than clear and convincing as to two of
> the statutory grounds but the record contains clear and
> convincing evidence to support one ground for termination.
> But because we also conclude that the evidence was less than
> clear and convincing that termination was in the child's best
> interest, we reverse the termination of the mother's parental
> rights.

I concur in the majority's decision with respect to the subject of grounds for termination;
but I disagree with the majority's judgment finding that the evidence does not show,
clearly and convincingly, that termination is in the best interest of the child. Accordingly,
I would affirm the trial court's judgment terminating mother's parental rights.

There is much in the record demonstrating that mother is not a candidate for a
"mother of the year" award. What follows is an excerpting of some of the material in the
majority's opinion. I am using these remarks to give the reader the "flavor" of this case:

> …Based on information that Mother provided during her
> assessments, the provider recommended that she complete
> intensive outpatient alcohol and drug treatment and individual
> mental health therapy.  The provider also indicated that
> Mother would benefit from medication management for any
> medication she was prescribed.  But Mother did not follow

-1-

the recommendations… At the adjudicatory hearing on March 11, 2016, the court found clear and convincing evidence that Serenity was dependent and neglected. Mother did not appear at the hearing. And on April 25, 2016, she tested positive for amphetamine and methamphetamine. After the positive drug screen, she enrolled in a recovery program, but dropped out a few months later. At the end of October 2016, she rented a trailer home, but was evicted after a few months because "[she] let just anybody in [her] house and the law was there constantly." After that, she lived either with relatives or on the streets.

In early November 2016, the court ordered her to submit to a hair follicle test, but Mother failed to comply by the court imposed deadline. At the review hearing on December 9, the court suspended her visitation until she appeared for a drug screen. Mother did not appear until February 2017. She had obtained the requested hair follicle test, but it was positive for methamphetamine. Even so, the court allowed her to resume supervised visitation because she passed the court-administered drug screen.

\* \* \*

Even after the termination petition was filed, [on March 31, 2017], Mother continued to use illegal drugs. After she missed a scheduled visit with Serenity in late April, the family service worker or FSW required Mother to submit to a drug screen before rescheduling the visit. Mother repeatedly failed to appear for the requested drug screen. As a result, she did not visit with Serenity again until September.

\* \* \*

At the termination hearing on February 2, 2018, the court heard testimony from the FSW, Mother, the foster mother, and Mother's grandfather. According to the FSW, Mother's compliance with the permanency plan was spotty. He acknowledged that she completed the required assessments

-2-

and classes. But she never provided documentation that she followed the recommendations from the assessments, and she failed to maintain stable employment or housing. Although she passed most of her drug screens, she had some notable fails.

Serenity had been in the same foster home for over two years. At three, she was thriving in her current environment. She had formed a strong bond with her foster parents, who were also her great-grandparents. The foster parents desired to adopt her.

According to the FSW, Mother attended approximately sixty percent of her scheduled visits. Most of her interactions with Serenity were appropriate. Based on the FSW's observations, Mother did not appear to have a close relationship with Serenity. Serenity never mentioned Mother to the foster parents and separated easily when the visits ended.

For her part, Mother acknowledged her past mistakes. She admitted to using methamphetamine as recently as September 2017. But she reported that she had been clean and sober since November 12, 2017, a record for her. All of her previous attempts to overcome her drug addiction had ended after a month. She was also employed, living in a stable home with her grandparents, and actively participating in mental health therapy and intensive outpatient drug treatment. Her outpatient treatment would be finished at the end of February.

\* \* \*

During the four-month period following removal, Mother completed parenting and domestic violence classes but made no attempt to address her drug addiction or mental health issues. She delayed submitting to the required assessments until after the four-month period. And even after the assessments, she failed to seek the recommended treatment…

\* \* \*

We cannot overlook Mother's extended period of inaction. Despite her early progress, Mother made no real effort to address the conditions that prevented reunification for almost two years. She admitted that she was still using methamphetamine in September 2017. While her recent efforts are commendable, the evidence was clear and convincing that Mother did not substantially comply with the requirements of the permanency plan…

\* \* \*

We conclude that, prior to the filing of the petition, Mother did not exhibit an ability and willingness to personally assume legal and physical custody or financial responsibility for her child. When the termination petition was filed, almost two years after Serenity entered foster care, Mother had not yet addressed her drug addiction or mental health issues. She also lacked stable employment and housing. Mother's lack of effort before the termination petition was filed undercuts any willingness argument. And her recent positive changes are of too short a duration to demonstrate that she is currently able to assume custody of her child…

\* \* \*

…Here, the trial court found that Mother's recent positive changes were insignificant in light of the length of time Serenity had been in foster care and that it was too soon to know if her adjustment would last.

\* \* \*

…We recognize that Mother's current sobriety is of short duration. She could relapse; she has done so before. And a relapse would jeopardize all of her recent progress…

-4-

* * *

> …The evidence does not preponderate against the trial court's finding that Mother did not visit regularly. She had several gaps in visitation and only attended sixty percent of her scheduled visits.

(Citations and section headings omitted.)

As previously noted, the trial court held that there was clear and convincing evidence that mother did not substantially comply with the requirements of the permanency plan. Tenn. Code Ann. § 36-1-113(g)(2). I agree. That determination has serious constitutional and statutory consequences. In the case of ***In re Jacobe M.J.***, 434 S.W.3d 565 (Tenn. Ct. App. 2013), we stated the following:

> When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. ***White v. Moody***, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004). When a parent has been found to be unfit upon establishment of a ground for termination of parental rights, then the interests of parent and child diverge. ***In re Audrey S.***, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). The focus shifts to the child's best interest. ***Id.*** at 877. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. ***Id.*** However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36–1–101(d). "The child's best interest must be viewed from the child's, rather than the parent's, perspective." ***Moody***, 171 S.W.3d at 194.

***Id*** at 572-73; *See also* ***In re Audrey S.***, 182 S.W.3d 838 (Tenn. Ct. App. 2005):

> The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests. However, as important as these interests are, they do

not dominate every phase of a termination of parental rights proceeding. The best interests of the child do not become the paramount consideration until the trial court has determined that the parent is unfit based on clear and convincing evidence of one or more of the grounds for termination listed in Tenn. Code Ann. § 36–1–113(g). Once a parent has been found to be unfit, the interests of the parent and the child diverge. While the parent's interests do not evaporate upon a finding of unfitness, **Santosky v. Kramer,** 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982), the focus of the proceedings shifts to the best interests of the child.

**In re Audrey S.**, 182 S.W.3d at 877.

The majority believes that the nine factors listed in Tenn. Code Ann. § 36–1–113(i) favor mother's position that the evidence does not show, clearly and convincingly, that it is in the best interest of the child to terminate mother's parental rights. I strongly disagree with the majority.

With all due respect, I believe that the majority has fallen into the error of approaching this inquiry from the standpoint of the mother and not the child. As a human being, and a parent, I can understand how one might make this error; but, as a judge, one must always remember that the issue is what is best for the child, not the mother. This child has languished in limbo for over three years. I firmly believe that the evidence shows, clearly and convincingly, that it is in the best interest of the child to be with and adopted by her blood kin.

Mother has not demonstrated that she is ready to parent the child. For three plus years, the child has had the presence and love of her great-grandparents. Their home is clearly a good place for the child. Mother, for too long, has lived a life on the dark side. The relevant four months have come and gone with no change in mother's lifestyle. The majority emphasizes the mother's improvement *following* the four months at issue. As a number of cases state, her acts are "too little, too late." *See e.g., **In re Emily N.I.**,* No. E2011–01439–COA–R3–PT, 2012 WL 1940810, at *16 (Tenn. Ct. App. May 30, 2012) ("We believe that the Parents' refusal to complete a number of the requirements until after the termination petition was filed ... was simply '[t]oo little, too late'" given the length of time the child had been removed from the parents' custody.) (quoting ***In re A.W.**,* 114 S.W.3d 541, 54647 (Tenn. Ct. App. 2003) (indicating that mother's efforts after the filing of the termination petition constituted improvement, but ultimately holding that such improvement was "[t]oo little, too late")); *see also **In re Jada T.L.P.**,* No. E2011–00291–COA–R3–PT, 2011 WL 3654486, at *6 (Tenn. Ct. App. Aug. 19, 2011) (holding that mother's submission to drug tests after the filing of the termination

petition was "too little, too late"). I would pave the way for the child to be adopted by these loving family members.

Accordingly, I respectfully concur in part and dissent in part.


_____
CHARLES D. SUSANO, JR., JUDGE