IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 7, 2006

# IN RE H.A. (D.O.B. 10/08/98) AND J.R.B., JR. (D.O.B. 11/24/99)

# STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES
v.
# MICHELLE ADAIR

**An Appeal from the Chancery Court for Shelby County**
**No. CH-01-2506-2     Arnold B. Goldin, Chancellor**

_____

**No. W2005-01912-COA-R3-PT - Filed October 5, 2006**

_____

This is a termination of parental rights case.  In 1999, the children involved in this action were taken from the mother's custody into state custody.  They were later adjudicated dependent and neglected by the juvenile court.  The children remained in foster care, and the state developed several permanency plans with the goal of returning the children to the mother.  The plans required the mother to, *inter alia*, attend parenting classes and anger management programs and to obtain stable housing and employment.  The children remained in foster care for the next six years.  Meanwhile, the mother obtained stable housing, but she failed to complete either parenting classes or an anger management program, and she failed to obtain stable employment.  The goal of the plans was changed to adoption.  The state filed a petition to terminate the mother's parental rights based on persistent conditions and failure to comply with the permanency plans.  After a trial, the trial court terminated the mother's parental rights on both grounds.  The mother now appeals.  We affirm, finding that the evidence supports termination on both grounds.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Deborah M. Henderson, Memphis, Tennessee, for the appellant, Michelle Adair.

Paul G. Summers, Attorney General and Reporter, and Amy T. Master, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

Respondent/Appellant Michelle Adair ("Mother"), is the biological mother of the two children involved in this action, H.A. (daughter, born 10/08/98) and J.R.B., Jr. (son, born 11/24/99). She gave birth to H.A. when she was eighteen (18) years old, and J.R.B., Jr. when she was nineteen (19) years old. On October 22, 1999, H.A. was hospitalized for ingesting bleach while in Mother's care. Petitioner/Appellee Tennessee Department of Children's Services ("DCS") referred Mother to a poison prevention class. On the day H.A. was hospitalized, Child Protective Services ("CPS") investigated Mother's home and found that the food in the home was inadequate and that the home had uncovered electrical outlets. CPS again visited Mother's home on October 28, 1999, and found H.A. alone in the home, eating off of the floor. DCS filed a dependency and neglect petition in the Juvenile Court of Memphis and Shelby County ("Juvenile Court"), and the Juvenile Court granted DCS temporary custody of H.A. on November 5, 1999.

On November 24, 1999, a little over two weeks after H.A. was taken into protective custody, her younger brother, J.R.B., Jr. ("J.R.B."), was born. While both J.R.B. and Mother were still in the hospital, Mother dropped the child. The staff at the hospital was concerned regarding Mother's ability to care for the child; they described her handling of J.R.B. over the course of more than one shift as "careless," indicated that she was wary and not cooperative with the staff, and perceived Mother's mental ability as "slow." A CT scan was performed on J.R.B., which showed no damage. J.R.B. remained in the hospital until December 8, 1999, when he was also taken into protective custody by DCS.

On December 17, 1999, the children's Guardian Ad Litem, attorney Yollander Holloway, filed a report with the Juvenile Court detailing her interview with Mother, personnel at the hospital at which J.R.B. was born, and others. Holloway indicated that the interview with Mother proved difficult. Regarding the incident in which J.R.B. was dropped, Mother insisted that hospital personnel were "lying" and that J.R.B. had merely "slipped." Holloway described Mother as appearing "out of it," and "staring as if she was in a trance." Mother refused to answer basic questions, such as whether she worked or used daycare or a babysitter. The visit was made more difficult by the presence of J.R.B.'s father in Mother's home. The report indicates that he was agitated, repeatedly exhorted Mother not to answer questions, and exhibited threatening behavior toward Holloway.

Holloway also interviewed hospital personnel who met with Mother after J.R.B. was dropped. The hospital personnel were most concerned about Mother's demeanor, describing her as "slow" and reluctant to answer basic questions such as where she lived. The nurse working the night shift took Mother's infant from Mother's room back to the nursery because she had previously observed Mother "being careless with the baby." A DCS worker interviewed by Holloway described Mother's demeanor in several meetings as "non responsive, with a flat affect."

On the same day, December 17, 1999, in separate orders, the Juvenile Court adjudicated H.A. and J.R.B. to be dependent and neglected. In the first order, the Juvenile Court found that, prior to

removal, Mother was warned on two occasions that H.A. was being kept in unsafe conditions. It determined that Mother had made no changes to the inappropriate living condition, and recited that reasonable efforts were made to prevent removal of the children from the home. As to J.R.B., the Juvenile Court noted that Mother had dropped him in the hospital shortly after his birth, and that hospital reports indicated that the hospital personnel perceived that Mother was careless in handling J.R.B. and did not know how to care for him. The dependency and neglect orders were not appealed. Both of the children were placed in foster care through the foster care placing agency, AGAPE Child and Family Services ("AGAPE"), and since then have remained in the care of foster parents Betty Jo and David Hill.

Over the course of the six years in which H.A. was in foster care, DCS developed six permanency plans for her. The first was developed on November 15, 1999. The goal of this plan was to return the child to Mother. The plan required Mother to complete an evaluation at the Center for Children in Crisis ("CCP")[1] and follow its recommendations, and also to attend parenting classes. In a drug test administered on November 9, 1999, Mother tested positive for marijuana. Based on this, the permanency plan required her to attend alcohol and drug treatment. It also required Mother to keep in weekly contact with DCS. Mother signed this plan, as well as the Adoption and Safe Families Act acknowledging that she received information on the ways in which her parental rights could be terminated.

Over the nearly six years in which J.R.B. was in foster care, DCS developed five permanency plans for him. The first for J.R.B. was developed on March 20, 2000, along with a revised permanency plan for H.A. The goal of these plans was to return the children to Mother. In order to meet that goal, Mother was required to attend a CCP evaluation and follow its recommendations, attend parenting classes at the Exchange Club and demonstrate appropriate parenting skills, receive alcohol and drug treatment, keep in weekly contact with DCS, attend anger management class, and obtain mental health counseling. Mother signed both plans.

Mother began some parenting classes at the Exchange Club Family Center ("Exchange Club"). When she was late for one session and would not do an assignment, she was informed that she would have to retake the parenting class. At that point, an altercation arose between Mother and the class facilitator in which Mother apparently threatened the parenting instructor; the police were then called. Mother was asked to leave the class and not return to the Exchange Club.

Mother participated in an initial interview at CCP on May 15, 2000, and an evaluation through CCP on July 13, 2000. The record includes a written summary and recommendations arising out of the interview and evaluation. In the history given in her interview, Mother said that she was placed in foster care when she was about three years old. Within a time period of about four years, Mother lived in four to six foster homes. Mother said that she had suffered abuse in several of the foster homes, including beatings and burns. When she was about seven years old, custody of

---

[1]The Center for Children in Crisis is part of the LeBonheur Children's Medical Center, Center for Children and Parents ("CCP").

her was finally given to her biological father, and she remained in his custody. Mother told CCP that she dropped out of school after the eleventh grade, had not received her GED, and gave birth to H.A. when she was eighteen (18) years old. Mother indicated that she no longer had a relationship with her father because he had made "false" reports of neglect on her part.

The CCP report notes that Mother's "presentation was one of marked immaturity," remarking that she had an extremely low frustration level, gave up on tasks easily, and was very guarded and mistrustful of the process. Her insight and judgment were described as "poor."

Based on the CCP evaluation, Mother was diagnosed with a significant personality disorder, "narcissistic, somewhat paranoid, and self-defeating." Mother's I.Q. was assessed as seventy-seven (77), placing her in the borderline to mildly retarded range, with a seventh-grade reading level. The evaluation concluded that Mother had a general level of functioning of forty-five (45) out of one hundred (100). The report states:

> In summary, interview data suggests [Mother] to be a very immature and irresponsible parent. She seemed to have minimal insight into the issues raised in this case and tended to rationalize and minimize problems. [Mother] probably has the potential for learning the bare essentials of parenting skills, but will likely ever be only marginally adequate. She will need a great deal of work in this area. . . .
>
> * * *
>
> The psychological evaluation of [Mother] does not bode well for her adequacy as a protective and non-neglectful parent. . . . Although the particular incidents which triggered the removal of these children may be relatively insignificant and could happen to anyone, there appears to be a much more pervasive problem with the functioning of [Mother] which is severe and relatively unlikely to relent to intervention.

CCP recommended that Mother complete parenting and anger management classes, individual counseling, and couples therapy to address domestic violence issues reported by J.R.B.'s father.

On February 13, 2001, another permanency plan was put in place for both children. These plans had the dual goals of returning the children to Mother and adoption. The plans required Mother to attend parenting classes at the University of Tennessee, Boling Center ("Boling Center"); attend anger management classes; obtain individual therapy; maintain stable housing and employment; and maintain regular visits with the children. The plans provided that DCS would be responsible for making arrangements for Mother to visit the children, and that she would have a minimum visitation of four hours monthly. Mother signed these plans.

On February 6, 2001, Mother began attending parenting classes at the Boling Center. Although she completed the classes, the Boling Center reported that she had a bad attitude during class, was difficult to work with, and did not benefit from the program. Mother later began individual counseling and anger management classes at Frayser Family Counseling Center. On

February 22, 2001, however, Mother brought a knife to her anger management class and consequently was asked to leave the class.

On July 31, 2001, the Juvenile Court entered an order that changed the permanency goal for both children to adoption only.

On December 13, 2001, DCS filed a petition to terminate Mother's parental rights. The petition sought to terminate based on Tennessee Code Annotated § 36-1-113(g)(3)(A), asserting that the children had been in DCS custody for more than one year and the conditions which led to the removal of the children persisted and would likely not be remedied at an early date, and also based on section 36-1-113(g)(2), asserting that Mother had not substantially complied with the responsibilities outlined in the permanency plans. DCS alleged that termination of Mother's parental rights was in the children's best interest. Despite the filing of the petition to terminate, no action was taken on the petition at that time.

At some point in 2002, Mother gave birth to her third child, a son. Mother voluntarily gave up custody of the third child to a friend, and her parental rights as to this child are not at issue.

In May 2002, attorney Lavern Mason King was appointed Guardian Ad Litem for the children. Counsel for Mother, as well as the children's fathers, was appointed.[2]

Meanwhile, on May 28, 2002, another set of permanency plans was developed for the children. The goal of these plans was adoption. The plans referenced a DCS Quarterly Progress Report which noted Mother's chronic forgetfulness regarding visitation, stating that DCS had given written visitation schedules to Mother, but she misplaced them and missed visits. The progress report observed that Mother was "limited mentally" and seemed "unable to understand how to care for her child. She seems unable to understand the child's basic needs." The plans required Mother to participate in regular visitation, attend parenting classes, attend anger management classes and demonstrate control of her anger, attend counseling, and maintain stable housing and employment.

On March 25, 2003, another set of permanency plans was developed for the children, both with the goal of adoption. Echoing the earlier plans, this set also required Mother to attend parenting classes in order to learn and demonstrate appropriate parenting skills, maintain a positive relationship with her children by regularly attending visits, attend anger management class and control her anger, learn coping skills for her mental health issues, attend individual counseling, maintain stable housing and employment, and provide a safe home for the children.

On October 30, 2003, Mother began an anger management class through the Exchange Club. Mother missed the first class session; nevertheless, the class facilitator, Hallie Cohen ("Cohen"), agreed to enroll Mother as a favor to Mother's DCS case manager. However, because Mother had

_____

[2]The parental rights of the children's biological fathers are not at issue in this appeal.

missed the first class, Cohen told Mother that she would receive only a letter of attendance for the class, not a graduation certificate.

On January 14, 2004, DCS developed its final permanency plans for the children, both with the goal of adoption. Under H.A.'s plan, Mother was required to attend additional parenting and anger management classes at the Women's Exchange, maintain regular visits with the children, obtain individual counseling, participate in anger management classes, and maintain stable housing and employment. J.R.B.'s plan was virtually the same, except that it acknowledged that Mother had completed an anger management class on November 11, 2003, through the Exchange Club. Despite having completed the class, the permanency plan did not indicate that Mother had fulfilled the plan goal of demonstrating that she knew how to control her anger. Consequently, AGAPE arranged for Mother to attend individual anger management counseling with Willie Holcomb, the AGAPE family services counselor. Out of four scheduled classes, however, Mother attended two. The permanency plan also noted that Mother completed parenting classes in 2001, but stated that the demonstration of her parenting skills needed to be "updated." The plan noted that Mother acquired housing on November 25, 2003.

On January 27, 2004, the Juvenile Court entered an order stating that "progress is not being made in compliance with the permanency plan" and suspended Mother's visitation privileges "until termination of parental rights are finalized." The order does not explain the reasons for suspending Mother's visitation. On July 23, 2004, the trial court entered an order reinstating Mother's visitation. At some point during this interim, Mother had her fourth child, a daughter, who continued to reside with Mother throughout these proceedings.

On August 26, 2004, Guardian Ad Litem ("GAL") Lavern Mason King filed an updated report.[3] In the report, King detailed interviews with DCS personnel who apparently disagreed with one another about the handling of Mother's case. The case manager, Joyce Henderson, felt that the DCS goal should be reunification, not adoption, believed that Mother had completed the requirements of the original permanency plan and was concerned about new plans which required Mother to repeat items that had been completed. The DCS Supervisor, Syretta Bumpus, reportedly "insisted" that the goal of the children's permanency plans should be adoption, not reunification with Mother, and King expressed misgivings about Bumpus' "determination to control this case's outcome. . . ." The new case manager, Keva Perry, told King that Mother had not completed some of the requirements of the permanency plans, such as successful completion of anger management classes, had not found suitable employment, and that there was continued concern about Mother's ability to care for four children. However, Perry also expressed concern to King that "a number of the requirements on the current permanency plan are being repeated at the insistence of DCS Supervisor Bumpus."

---

[3]The "updated" report refers to a prior investigation a year earlier. Any report of such an investigation was not included in the record on appeal.

In her report, GAL King also expressed concern that the children's foster mother became overly-involved and did not respect the appropriate boundaries for a foster parent. She cited as an example that Juvenile Court's earlier order stopping Mother's visitations with the children, which was entered at the request of the foster mother, without input from DCS, because the foster mother disagreed with some of Mother's remarks to the children regarding race. King was concerned that the foster mother did not seem to understand the purpose of the permanency plans or "the fact that it is not a foregone conclusion that the rights of the birth parents will be terminated." King also noted, however, that the foster mother was genuinely concerned about the welfare of the children, discussed in detail J.R.B.'s behavior problems, and was interested in adopting both children.

From King's interview with Mother, she surmised that Mother's housing was well-kept and sufficient for herself and the children. She was unmarried and unemployed, but received AFDC benefits. She described plans to receive training to become a certified nurse assistant. Mother indicated to King that she had completed anger management classes in 2003 and "seemed unaware of any problems with the status of her completion."

Considering her investigation, GAL King stated that Mother did not "appear to be equipped to handle the care and upbringing of four children now and I am concerned that she may not be able to do so in the near future." Nevertheless, King felt that "the goal in this case should ultimately be reunification."

In the fall of 2004, J.R.B., by then almost five years old, was evaluated by CCP psychologist Chris Bertram. J.R.B. was described as "extremely difficult to direct" and "provocative, impulsive and hyperactive during evaluation." He was reported to exhibit disruptive and compulsive behaviors in his home with the foster parents. The examiner opined that J.R.B. could have a serious underlying problem, such as bipolar disorder, but also observed that part of his behaviors were "related to the permanency issues that have overshadowed [his] psychological development."

In October 2004, Mother participated in a second evaluation at CCP and was interviewed by Emily Susan Moffatt ("Moffatt"), a licensed clinical social worker, and Earle Donelson, Ph.D. ("Donelson"), a psychologist. In this evaluation, Mother's account of her childhood was different from the account given in her first evaluation. In this evaluation, Mother claimed that she was raised by her paternal aunt and uncle and never knew her father. She told Donelson that she had graduated from high school in 1997 and was currently enrolled in a Certified Nursing Assistant Program. In contrast to what Mother told Donelson, she told Moffatt that she had obtained her registered nursing degree and would be attending medical school in December 2004. In fact, Mother had never graduated from high school. Mother also denied that she had ever tried any alcohol or illegal drugs, even though she had tested positive for marijuana in a drug screen in 2000. Mother maintained that the positive result on the drug test was simply wrong.

During the CCP evaluation, Mother was observed interacting with the children. The social work intern noted that, at first, the children warmly greeted Mother with hugs. Later, the children seemed to ignore Mother and continue playing. Mother "went into the play area with [H.A.] and

wrapped her arms around her. [H.A.] said that she wanted to play with her doll, but [Mother] refused to let go of her." At that point, the social worker intervened and asked Mother to let go of H.A. so that she could play. J.R.B. was reported as being "particularly uncomfortable around his mother, and [Mother] spoke more harshly toward him than his sister . . . ." Mother also pitted H.A. and J.R.B. against each other and laughed as they argued with each other over a soda. As the children's argument escalated, the social worker intervened and took the soft drink away from the children.

Ultimately, both Moffatt and Donelson concluded that, since her evaluation in 2000, Mother had made little progress toward acquiring the ability to provide appropriate care for her children. They believed that Mother failed to understand her children's needs and placed her own needs above theirs. Moffatt deferred a final recommendation until further psychological evaluations were completed, but Donelson concluded that Mother "cannot be endorsed for the return of her children." He recommended that termination of Mother's parental rights "be considered as in the children's be[st] interests."

On June 8, 2005, the next Guardian Ad Litem for the children, attorney Curtis Johnson, filed his report.[4] After interviewing Mother, the children, the foster parents and the AGAPE counselor, GAL Johnson reported that Mother was living in an apartment with the younger siblings of H.A. and J.R.B., apparently not employed but receiving AFDC benefits. He stated that during Mother's visits with the children, she said things that upset them, such as telling them to pack their bags because they and J.R.B.'s father were going to move back in with her. Johnson stated that both children were confused and upset, and J.R.B. in particular acted out aggressively before, during, and after the visits. Johnson noted that "the children have been in the Department's custody for almost five years without any meaningful attempt by the mother to regain custody," and he recommended termination of Mother's parental rights.

The trial on the petition for termination was held on June 9 and 10, 2005. DCS presented four witnesses along with documentary evidence to support its petition.

Moffatt, who had worked at CCP for twenty-seven (27) years, testified that she was the social worker at CCP who managed Mother's case and performed the second evaluation in 2004. Moffatt was not involved in the case from the beginning and testified from records about the events that led to the removal of the children from Mother, including H.A.'s ingestion of bleach and Mother dropping J.R.B. soon after he was born.

Moffatt testified about the CCP's evaluations of Mother. She noted that the first evaluation revealed that Mother has borderline intelligence, and acknowledged that this fact alone did not prove that Mother was incapable of being an adequate parent for the children. Mother, however, had other problems that needed to be resolved in order for her to provide a safe home and become an adequate

---

[4]Attorney Lavern Mason King was permitted to withdraw as Guardian ad Litem in November 2004, and Mr. Johnson was appointed.

parent. In a test of overall functioning administered by the CCP psychologist, Mother scored a forty-five (45) out of one hundred (100). Though Mother denied any violence in the home, there was substantial evidence to the contrary. J.R.B.'s father, who lived with Mother at the time of CCP's initial evaluation in 2000, admitted to a "whole range of aggressive sorts of behaviors" and told the CCP that he and Mother "laid hands on each other when they got angry at each other." Moffatt also noted that J.R.B. was a special needs child, and had issues related to anger, anxiety, and impulsivity. After the first evaluation, CCP made several recommendations to help Mother deal with her problems, including the recommendation that she complete a parenting program, participate in individual therapy, become independent, and develop a minimally adequate level of protective and altruistic parental functioning. CCP also recommended that Mother be required to visit the children regularly and obtain stable housing and employment.

By the second evaluation in 2004, Moffatt said, Mother had attended some parenting programs, but noted that some of the people who had been working with her reported that Mother "had not changed her behavior in terms of learning to implement the things that they were trying to teach[;] . . . as far as actually changing her behavior, she had not done so. Moffatt said that Mother apparently had not learned to control her anger, according to the reports of the Exchange Club. Moffatt said that it was "difficult to believe anything that [Mother] said," because she changed her story about her situation during the interview. For example, Mother told a completely different story about her childhood in the second interview than she did in the first. Furthermore, she told Moffatt during the second evaluation that she had completed her RN degree and had decided to go to medical school, even though she had not even received a high school degree. Moffatt knew that the story "was just ludicrous." Later, Mother told a different CCP psychologist that she planned on going to Certified Nursing Assistant school.

Moffatt stated her belief that Mother seemed incapable of dealing with J.R.B.'s special needs. In contrast, the foster mother had researched J.R.B.'s problems and had worked with the psychologists at AGAPE to help her deal with J.R.B.'s special needs. Moffatt said that, based on Mother's lack of progress and continued difficulty parenting the children, CCP recommended termination of Mother's parental rights. She further testified that she believed it to be in the children's best interest that Mother's parental rights be terminated.

Hallie Cohen, the class facilitator at the Exchange Club, also testified at trial. Cohen said that DCS had referred Mother to her anger management class in October of 2003. By that point, Mother had missed the first class session and students are not ordinarily permitted to pick up the class. Nevertheless, at the urging of Mother's DCS caseworker, Cohen allowed Mother to join the anger management class. When Mother missed a second class, Cohen called her DCS caseworker to let her know that Mother could not continue. Mother's DCS caseworker told Cohen that Mother had prearranged conflicts and urged Cohen to allow Mother to remain in class. Cohen allowed her to stay in the class, but told Mother and her DCS caseworker that she would receive only a certificate of attendance and not a certificate of completion. Mother ended up missing a total of three out of eight classes but attended make-up sessions for a portion of the missed classes. During the classes Mother attended, Cohen described Mother as being there in body only, explaining that Mother did

not speak, share, or otherwise show that she had learned anything, "which is really one of the requirements of the class that you participate."

As Mother had been told, at the end of the anger management course, she received a letter stating which classes she attended, but did not receive a certificate of completion. Subsequently, Mother's DCS caseworker asked Cohen to summarize Mother's participation in the classes. In response, in January 2004, Cohen wrote another letter to DCS. It noted that, when Mother came to class on the first day, one of the staff members recognized her as having been asked to leave the parenting classes and never return. Cohen said that Mother was not an active participant, and this caused Cohen to ask Mother if there was a problem. Mother's response to Cohen was that she was not comfortable in groups. When Cohen reminded Mother that she would not get a certificate of completion, Cohen said, Mother became argumentative, upset, and "verbally aggressive." Based on Mother's continued verbally aggressive behavior, Cohen concluded that Mother did not benefit from the anger management classes and "she did not demonstrate the grasp of anger management concepts."

The trial court also heard testimony from George Kohlbacher ("Kohlbacher"), a family preservation counselor at AGAPE. In November 2004, Kohlbacher was assigned to work with Mother to meet the goals of her permanency plan and try to reunify Mother with her children. In accordance with the permanency plan, Kohlbacher took Mother for a drug screen, which turned out negative. He also visited Mother's home and was satisfied that she had safe and stable housing. Nevertheless, despite the fact that Mother apparently achieved the goals of remaining drug-free and having stable housing, Kohlbacher was of the opinion that other requirements of the permanency plan had not been met. Kohlbacher referred Mother to the counseling department at AGAPE for help with anger management issues, but she attended only two out of four sessions. The counselor at AGAPE was unable to help Mother because Mother was in denial that she had an anger management problem. Mother also worked with an anger management counselor at Mississippi Boulevard Christian Church, but that counselor also ultimately refused to see Mother because of Mother's denial and lack of insight. Therefore, Kohlbacher testified, Mother did not complete any anger management program. Kohlbacher also attempted to get Mother into parenting classes. He was unable to get Mother into the Exchange Club parenting classes because of her previous history there; he referred her to Mississippi Boulevard for parenting classes, but she did not complete the program there. AGAPE had no parenting class available while Kohlbacher was working with Mother. Therefore, Kohlbacher said, Mother completed no course of parenting classes. Overall, Kohlbacher was of the opinion that Mother did not successfully complete the goals of her parenting plan.

Mother's DCS case manager since June 2004, Keva Perry ("Perry"), testified at trial. Perry said that, on several occasions, DCS explained to Mother what she needed to do in order to regain custody of her children, and that these requirements were set out in the permanency plans. Perry testified about the goals of each permanency plan, as outlined above, and noted that the requirements of all of the plans were essentially the same.

Perry also testified that Mother did not complete all of the requirements of the permanency plans. Perry acknowledged that Mother's drug test in 2000 was negative and that she had no reason to believe that Mother was using drugs. However, Mother did not complete any program of anger management or parenting classes. Although DCS referred Mother to three different agencies — the Frayser Family Counseling Center, the University of Tennessee Bolin Center, and the Exchange Club — Mother was kicked out of the Frayser Family Counseling Center, did not grasp the concepts or complete any of the other programs, and failed to demonstrate that she benefitted from any of the programs she attended.

Mother's visitation began in 2000, and she was required to have supervised visitation four (4) hours each month. Perry characterized Mother's visitation as sporadic, and said that the visitation hours were reduced because Mother did not comply with visitation and because the children became distraught and upset after each visit. After Mother's visitation was reinstated in July 2004, it was again sporadic. Consequently, in September 2004, DCS began to require Mother to call three hours before each visit to confirm whether or not she would attend the visit. At first, if Mother did not call, the children were brought to the visit assuming that Mother would attend. On two occasions, Mother did not call, the children were brought to the visit, but Mother never showed up. After that, DCS stopped bringing the children to the visits unless Mother called three hours in advance to confirm that she would come. Because transportation was an issue for Mother, DCS took her to visit the children on several occasions, and on other occasions it found transportation for her through Omni, a transportation service. When Mother was provided transportation, she attended visits more often. Perry estimated that, overall, since June 2004 when she became the case manager, Mother kept less than 50% of her visits.

Perry described the children's visits with Mother. She said that, at their visits, J.R.B. did not embrace Mother, but H.A. bonded with Mother and would embrace her. Mother had given birth to another child, a daughter, whom she brought with her on visits with the children. H.A. embraced the child, but J.R.B. did not acknowledge her. During the visits, Perry said, the children were violent with each other, and Mother just sat back and observed, forcing the supervisor to intervene and ask the children to stop fighting. Perry said that the children "had nothing good to say about the visits."

Perry also testified about the children's situation in their foster family. She said, during their years in foster care, the children have bonded with their foster parents, and that they are a well-rounded family. In addition to H.A. and J.R.B, the foster family has two younger biological children. Perry testified that H.A. and J.R.B. refer to their foster parents as "mom and dad," and refer to Mother as "Michelle" when she is not present. In Mother's presence, however, she demands that they refer to her as "mom." Overall, Perry concluded, it would be in the children's best interest to terminate Mother's parental rights.

Mother testified at trial on her own behalf. She stated that she lives in a three-bedroom apartment with her youngest daughter, who was one year old at the time of trial. Mother stated that she has a fourth child, a son. Mother explained that she had voluntarily given custody of this child to a non-relative one year prior to trial because she was homeless for a couple of months. At the

time of trial, Mother was involved in legal proceedings to regain custody of this child, and she indicated that the court involved in those proceedings had already decided to give custody back to her.

At the time of trial, Mother was unemployed but trying to find a job. She acknowledged that she had not graduated from high school, but claimed that she was working on her GED. Mother testified that, in the past, she had worked as a secretary for a youth program, and at the airport assisting people who are disabled. Mother stated that she receives $142 per month in AFDC benefits. When asked how she intended to support herself and her children, Mother claimed that J.R.B.'s father, H.A.'s father, and their families would support her until she could maintain a steady job.

Mother said that DCS's only visits to her home were on October 28 and November 5, 1999. At those times, she said that she was not given any instructions. Mother maintained that there was "plenty of food" in the home when DCS visited. Regarding allegations that she left H.A. alone in the home, Mother claimed that it happened on only one occasion, on October 28, 1999. She explained that she had gone downstairs to her neighbor's home to use the telephone because she did not have one. No one was home, and when she was came back upstairs the DCS representative was there to discuss with her the incident in which H.A. ingested bleach. Mother said that the DCS representative gave her no instructions on that day. The next time DCS came to her home was on November 5, 1999, when they took custody of H.A. She said that no one inspected her home at that time. Mother maintained that, although she had no socket covers, H.A. had been trained not to go near the outlets.

Mother said that her visits with the children went "very well" up until visitation was stopped in January 2004 by the Juvenile Court. Mother testified that the visits were stopped because of allegations by the foster mother that Mother was "a racist and [she] was teaching them to hate her because she was white and they were black." When the visits resumed in July 2004, Mother stated, things were not the same. J.R.B. acted out, not only with her but with everyone. Prior to January 2004, Mother asserted, she had only missed "three or four" scheduled visits with the children. She said that she missed visits only when she had a doctor's appointment because she was pregnant with twins. After visits were resumed in July 2004 up until the time of trial, Mother said that she only missed three visits.

Referring to J.R.B.'s father, Mother said that the children had a very good relationship with "their" father. She said that he had moved away to take care of his mother. Mother acknowledged that H.A.'s father was not supportive, but said that his family provided "great support." On cross examination, Mother admitted that J.R.B.'s father had not visited the children in one or two years. She further admitted that neither H.A.'s father nor his family had ever given her financial support. When she was homeless, they did not take her in because she did not tell them that she was without a home. Furthermore, they did not know until March 2002 that Mother had lost custody of the children.

Mother was asked about her compliance with the DCS permanency plans. She said that she had complied by attending parenting classes twice and by attending an anger management class. Mother noted that she took classes at the Exchange Club in 2000, but explained that she was kicked out because she was not comfortable being in or talking in group settings. Mother said that she later went to Mississippi Boulevard Christian Church, but claimed that they did not offer either anger management counseling or parenting classes. She testified that the representative at Mississippi Boulevard told her that she "didn't see how she could help. But I did attend a couple of sessions. I never missed a session." Mother introduced into evidence a letter dated May 13, 2005, from HopeWorks, a career and personal development organization, indicating that she had been participating in career development programs through that organization. The letter indicated that, during the fall of 2003, Mother had attended each day, Monday through Friday from 9:00 a.m. through 4:00 p.m., and that she had met the attendance and participation requirements of the program.

Mother also stated that she complied with the permanency plans by participating in the required evaluations and noted that she had no record of drug abuse. She claimed that she never used drugs when she was pregnant with any of her children. She thought that her positive test result in 1999 must have been caused by a mix up between her sample and the sample from J.R.B.'s father, taken at the same time.

When asked how she would provide for the children's education if they were to live with her, Mother stated that a bus could transport them to the nearby public school. She said that she could take the bus to go any other places she needed to go. She testified that their medical care would be covered by her insurance, Omni Care. Mother was aware that, in their foster family, the children had been involved in extracurricular activities. She testified that if the children came to live with her, they could be involved in after-school programs at a church near her home. Asked what she could offer the children, Mother testified that they should be with her because she is their natural mother and because they needed to know their younger siblings.

Mother asserted that she did not refuse to do anything that was requested of her by DCS, and that there was nothing she would not do in order to get her children back. Mother acknowledged that she had her children when she was very young, and that she was not the best parent, but said that she also was not a bad parent. She believed that she could provide a safe home for the children, and that it was in their best interest to live with her.

At the conclusion of trial, the trial court held that DCS had carried its burden of proving by clear and convincing evidence that Mother's parental rights should be terminated based on the grounds of (1) substantial non-compliance with the permanency plans and (2) the persistency of the conditions which led to the removal of the children. The trial court further held that it was in the children's best interest to terminate Mother's parental rights. On June 24, 2005, the trial court entered an order consistent with its oral ruling. In reaching its conclusion, the trial court made the following findings of fact:

(1) That the Petitioner has provided clear and convincing proof of the allegations in the petition, to wit, that pursuant to T.C.A. 36-1-113(g)(2) there has been substantial noncompliance by the Respondent parents with the statement of responsibilities in the permanency plans pursuant to provisions of title 37, chapter 2, part 4, and, pursuant to T.C.A. 36-1-113(g)(3)(A) the children have been removed from the home of the parent or guardian by order of a court for a period of six (6) months and (i) the conditions which led to the removal of the children or other conditions which in all reasonable probability would cause the children to be subjected to further abuse or neglect and which, therefore, prevent the children's safe return to the parent still persist, (ii) there is little likelihood that these conditions will be remedied at an early date so that the children can be safely returned to the parents in the near future, and (iii) the continuation of the parent or guardian and child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home.

* * *

(4) The Court further finds that the children have been placed by the Department of Children's Services in a foster home that is safe and nurturing and that the children are doing well in that placement.

(5) The Court further finds that [Mother] has failed in her personal responsibility as a parent in that she provided no evidence that she complied, even minimally, with the goals of the permanency plans. Specifically, the testimony of Susan Moffatt, licensed Social Worker for the LeBonheur Center for Children and Parents testified that [Mother] is unable to control her anger, she lies, focuses on herself rather than her children, and maintains a home that is unsafe for children. Ms. Moffatt, accordingly, recommended termination of [Mother's] parental rights.

(6) The Court further finds that the Department of Children's Services attempted to provide anger management services and parenting classes through the Exchange Center. Hallie Cohen testified that [Mother] failed to appear and to participate and was allowed to remain in classes because DCS urged the Exchange Center to accept her as a special favor to the agency. [Mother] failed to earn a certificate of completion and received, rather, a letter detailing her attendance.

(7) The Court further finds that George Kohlbacher, a Family Preservation Specialist, tried to get [Mother] to participate in anger management and parenting classes but to no avail. [Mother] failed to follow the recommendation that she see Willie Holcomb, Agape Family Services Counselor, for counseling.

(8) The court further finds that [DCS] provided six parenting plans for [H.A.] and five parenting plans for [J.R.B.]. [Mother] complied with none of them.

(9) The Court finds the evidence in this case to be overwhelmingly clear and convincing. [Mother] has taken no responsibility toward earning the return of her children. The Court finds that it would be unconscionable to return the children to [Mother]. The children are placed in a good (foster care) environment in which they are doing well. There is no relationship between [Mother] and the children. Further, [Mother] only gives excuses for her total lack of responsibility.

-14-

(10) Further, the Court finds that [DCS] went over and beyond what the law requires with respect to providing reasonable efforts to assist [Mother].

Mother now appeals the trial court's decision.

On appeal, Mother argues that DCS did not prove by clear and convincing evidence the grounds for termination of her parental rights. She argues as well that there was not clear and convincing evidence that termination of her parental rights was in the children's best interest.

In Tennessee, proceedings to terminate parental rights are governed by statute. A party seeking to terminate parental rights must prove two elements. First, the petitioner must prove the existence of at least one of the statutory grounds for termination. T.C.A. § 36-1-113(c)(1) (2005); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Second, the petitioner must prove that terminating the parent's parental rights is in the child's best interest. T.C.A. § 36-1-113(c)(2) (2005); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000). The statute requires that both of these elements be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the heightened burden of proof required in termination proceedings, our customary standard of review must be adapted in such cases. Under Rule 13(d) of the Tennessee Rules of Appellate Procedure, in termination proceedings as well as other proceedings, the trial court's findings of fact are reviewed *de novo* upon the record, presuming those findings to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). However, we must "draw a distinction between specific facts and the combined weight of these facts." *In re Audrey S.*, 182 S.W.3d 838, 861 n.26 (Tenn. Ct. App. 2005). While we presume that the trial court's specific findings of fact are correct, so long as they are supported by a preponderance of the evidence, we "must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion." *Id.* Great weight is afforded to the trial court's credibility determinations; those determinations are not reversed absent clear evidence to the contrary. *See Jones*, 92 S.W.3d at 828.

Mother first argues that the State did not prove by clear and convincing evidence that she had not substantially complied with the permanency plans.[5] She argues that the evidence showed that she substantially complied with the goals of the plans. Mother cites Kohlbacher's testimony, in which he confirmed that Mother's drug screens results were negative and she had maintained stable housing. He further testified, Mother points out, that he did not investigate why Mother had not completed the anger management program, even though he was aware that she attended some

---

[5]Surprisingly, the brief filed by Mother's attorney asserts that "there was no finding that the conditions which led to the removal or other conditions which in all reasonable probability would cause the children to be subjected to further abuse or neglect still persists. . . ." Clearly there was such a finding in paragraph (1) of the trial court's order. Nevertheless, since Mother asserts on appeal that grounds for termination were not proved, we will consider that the issue of persistent conditions was raised on appeal as well.

classes. Further, Kohlbacher admitted that no classes were being offered by AGAPE, so Mother did not have the option of attending classes there. Overall, Mother argues, the evidence shows that she substantially complied with the requirements of the plans.

Parental rights may be terminated based upon a finding of clear and convincing evidence that a parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan or plan of care." T.C.A. § 36-1-113(g)(2) (2005). This Court has recognized that section 36-1-113(g)(2) does not require *complete* compliance with the DCS permanency plans; rather, it requires only *substantial* compliance. *See In re T.L.*, No. E2004-02615-COA-R3-PT, 2005 WL 2860202, at *11 (Tenn. Ct. App. Oct. 31, 2005) (concluding that fulfillment of six of the eight goals of the permanency plans constituted substantial compliance). To assess a parent's compliance with a permanency plan, the court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). The permanency plans are not just a series of hoops through which a biological parent must jump. The parent must make a meaningful effort to place himself or herself in a position to adequately care for the child. *In re C.S., Jr.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006).

In this case, these children were taken into protective custody by DCS under circumstances which, while cause for concern, were less alarming than the circumstances which usually prompt such action. Indeed, comments by DCS personnel and hospital personnel seem to indicate that much of the concern was caused not by H.A. being left alone twice or by J.R.B. being dropped, but more by the perception that Mother was "slow" or "immature" or "out of it." Nevertheless, there was no appeal of the Juvenile Court's determination that the children were dependent and neglected.

Once the children were taken into DCS custody, DCS was obligated to evaluate Mother's parental functioning and abilities, and to develop permanency plans to ensure that returning the children to her care would not result in neglect or abuse. There is no argument on appeal that the requirements of the permanency plans were not reasonably related to the goal of addressing real issues regarding Mother's parenting skills, anger management, and ability to support herself and four children.

The evaluations of Mother resulted in findings of traits which, while related to her abilities to parent, are somewhat intractable, such as Mother's borderline I.Q., low functioning level, and significant personality disorders. Any one of these characteristics would be a significant challenge and would require substantial support in other areas which lend themselves to training or rehabilitation, such as parenting skills or job training. All of these characteristics together present a daunting challenge indeed.

In Mother's case, for whatever reason, she failed to meaningfully participate in the training that was offered to her.[6] While Mother attended some parenting classes, she apparently did not put to use the skills that were taught, and she demonstrated a failure to grasp basic parenting skills. She participated in the CCP evaluations, but did not obtain the recommended intensive follow-up counseling. Mother attended some anger management classes, but failed to participate, denied that she had a problem, continued to act in a verbally aggressive manner, and ultimately was barred from returning to the Exchange Club. She attended a job training course through HopeWorks in 2003, but two years later remained totally dependent on public assistance. Thus, while Mother in fact had safe and stable housing and remained drug free, there remained serious impediments to her ability to adequately parent her children.

Under all of these circumstances, we agree with the trial court that the evidence established clearly and convincingly that Mother has not complied substantially with the requirements of the permanency plan, and that her parental rights may be terminated upon this ground. ***See DCS v. A.B.B.***, No. E2004-01306-COA-R3-PT, 2005 WL 74101, at *2 (Tenn. Ct. App. Jan. 13, 2005) (determining that the mother had not substantially complied with the permanency plan when she had complied with some requirements but failed to complete the "key" requirement of completing a drug treatment program). For the same reasons, we also agree that the State established by clear and convincing evidence grounds for termination under Tennessee Code Annotated § 36-1-113(g)(3)(A), that is, persistent conditions which in all reasonable probability would cause the children to be subject to further abuse or neglect if they were returned to the custody of Mother.

Mother also argues that the trial court erred in determining that termination of her parental rights was in the children's best interest. In order to make this determination, the trial court was required to consider all relevant factors, including the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

---

[6]Many of the reports in the record indicate that Mother was wary of DCS and uncooperative with its processes, perhaps stemming from her reported background of abuse while she was in foster care as a child. Regardless of the reason, the repetitive requirements of the multiple permanency plans apparently were the result of Mother's failure to fully cooperate and to absorb the information taught in the classes and training.

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

T.C.A. § 36-1-113(i) (2005).

Mother argues that the application of these factors weigh in her favor because the children are presently living in Olive Branch, Mississippi with a couple of a different ethnic background from the children. She claims that the evidence established that she interacts well with H.A. during their brief visits. It is not surprising, Mother notes, that the children are more bonded with the foster mother than with her, because the children have lived with the foster parents since they were very young, and so this fact does not establish that the children are better off without Mother in their lives.

To the contrary, the evidence establishes clearly that allowing the children to remain in limbo in foster care weighs heavily on them, and that the continued visits with Mother are upsetting and destabilizing to them. J.R.B., a special needs child, is especially vulnerable to the uncertainty and anxiety associated with being in an unsettled family situation. The children have thrived in the care of their foster parents, and terminating Mother's parental rights so as to make the children available for adoption would provide them a permanent and stable home. Under these circumstances, we affirm the trial court's conclusion that clear and convincing evidence establishes that terminating Mother's parental rights is in the children's best interest.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Michelle Adair and her surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE