IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 21, 2010

IN RE: DRAVYN L.D.

Appeal from the Juvenile Court for Wilson County
No. 7076      C. Barry Tatum, Judge

No. M2009-00357-COA-R3-PT - Filed February 25, 2010

The Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of Candis D. ("Mother") with respect to her minor daughter, Dravyn L.D. ("the Child"). The petition alleged multiple incidences of abandonment, substantial noncompliance with a permanency plan, and persistent conditions.  The juvenile court terminated Mother's parental rights upon finding that each of the grounds alleged was established by clear and convincing evidence.  Mother appeals.  She contends that DCS's handling of the case  effectively denied her the right to due process.  She further challenges the juvenile court's finding that she was in substantial noncompliance with the permanency plan.  We affirm.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed;  Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Adam Wilding Parrish, Lebanon, Tennessee, for the appellant, Candis D.

Robert E. Cooper, Jr., Attorney General and Reporter and Douglas Earl Dimond, Senior Counsel, Office of Attorney General and Reporter, Nashville, Tennessee, for the appellee, State of Tennessee Department of Children's Services.

**OPINION**

The Child was born to Mother and Christopher D. ("Father") on May 25, 2006.[1] Less than four months later, on September 4, 2006, Child Protective Services ("CPS") received a referral concerning the Child after Mother and Father were brought to the sheriff's department on outstanding warrants and drug use was suspected. At that time, Mother admitted an extensive history of drug use to the CPS investigator and underwent a drug screen, on which she tested positive for cocaine use. For her safety, and with Mother's agreement, the Child was placed in foster care with Camilla and Stanley B. ("the foster parents"), an aunt and uncle of Father. Within a day after taking in the Child, the foster parents contacted CPS to report that they were concerned that something was wrong with the Child other than her suspected exposure to drugs. Further examination revealed that the Child had suffered injuries including several broken bones – a fractured skull, fractured ribs, and fractured femurs – and a hematoma behind her eyes. In addition, although the Child had weighed nearly seven pounds at birth, she weighed only nine pounds at the age of three months. Following a hearing, the Child was taken into the temporary protective custody of DCS based upon the court's finding that it was contrary to the Child's welfare to remain in her parents' custody "due to the extent and nature of [the Child's] injuries." In October 2006, following treatment for her injuries, the Child was returned to the custody of the foster parents where she has remained to the date of the hearing.

On September 14, 2006, Mother participated in the development of a permanency plan with DCS staff that stated a dual goal of reunification of the Child with her parent(s) or adoption. As set out in the plan, Mother was required to obtain and maintain a stable income and stable housing for four consecutive months; complete a parenting assessment; obtain a clinical 5-Axis evaluation; obtain treatment for her panic attacks; complete an alcohol and drug assessment and submit to random drug screens; pay child support as ordered of $25 per week; maintain contact with DCS and attend all team meetings and hearings on the Child's case; incur no new criminal charges and resolve all existing legal charges including payment of restitution and court costs; and follow all recommendations of any required assessments. While the initial permanency plan underwent several revisions from December 2006 throughout 2007 and into 2008, the original responsibilities Mother was charged with achieving essentially remained the same. The revised plans primarily extended the dates by which Mother was responsible for completing required actions and added some new requirements.

---

[1]An order reflecting that Father voluntarily surrendered his parental rights to the Child was entered in the court below on January 25, 2008. As a result, as to Father, DCS dismissed the termination petition as being moot. Father did not appear at the termination hearing and is not a party to this appeal.

After the Child's removal, Mother was arrested twice in December 2006 on unrelated charges of criminal impersonation and criminal trespass. On January 13, 2007, she was briefly jailed on older worthless check charges and released on January 24. Three weeks later, she was indicted on assault charges stemming from the injuries to the Child and was returned to jail and later released on bond in April 2007. On August 28, 2007, Mother was arrested on a new charge of theft over $1,000; as a result, her bond was revoked and she was returned to jail, where she remained through the conclusion of the juvenile court proceedings in this case. Mother entered a "best interest" guilty plea to a charge of aggravated assault by failing to protect the Child and was sentenced in February 2008 to a six-year prison term.[2] Parole was denied following a hearing in June 2008, meaning that Mother would serve at least two more years, until mid-2010, before she could request parole again. In addition, pursuant to her guilty plea to the felony theft charge, she was sentenced to three years to run consecutive to her sentence on the assault conviction. At the time of the termination hearing, Mother acknowledged that she could potentially be incarcerated for five more years in the absence of an earlier release on parole.

The Child was adjudicated as dependent and neglected by stipulation of all parties in January 2008. By February 2008, the sole goal of the plan, as revised, was adoption of the Child. On May 19, 2008, DCS filed a petition seeking to terminate Mother's parental rights. Hearing on the petition began in May 2008 and continued over several dates before being concluded on September 29, 2008. By that time, the Child had been in foster care with the foster parents for two years. On February 12, 2009, the trial court ordered Mother's parental rights terminated. In support of its order, the court found that the proof clearly and convincingly established multiple statutory grounds for termination and that termination was clearly and convincingly in the best interest of the Child. Mother filed a timely notice of appeal.

II.

As stated in her brief, Mother raises the following two issues on this appeal:

> 1. Whether the misconduct and acts and omissions of DCS constitute a violation of Mother's constitutional right to due process.
>
> 2. Whether Mother was in substantial noncompliance with the terms of the permanency plans and whether she could be found

---

[2]The record indicates that Father pleaded guilty to aggravated abuse of the Child and received a fifteen-year sentence.

in noncompliance of orders and permanency plans that were never signed, ratified, and/or filed.

## III.

Our review of this bench trial is *de novo*. The trial court's findings of fact, however, come to us with a presumption of correctness that we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded to the trial court's determinations of witness credibility, which shall not be ignored by us absent clear and convincing evidence against those determinations. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). No presumption of correctness attaches to the trial court's conclusions of law. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002); *Jahn v. Jahn*, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996).

It is well established that parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). A parent's rights may be terminated only upon a finding by the court (1) "that the grounds for termination of parental or guardianship rights have been established"; and (2) "[t]hat termination of the parent's or guardian's rights is in the best interests of the child." Tenn. Code Ann. § 36-1-113(c)(Supp. 2007); *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). Both of these elements must be established by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed Aug. 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

On our review, we proceed mindful of our duty "to determine whether the trial court's findings, made under this clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d at 530.

-4-

Mother asserts that DCS's handling of this case was "specifically designed and intended to frustrate and undermine . . . Mother's attempts [at] reunification" with the Child. Mother submits, for example, that her DCS case manager failed to conduct drug testing at a time when Mother's visitation with the Child was dependent on Mother remaining drug free despite the fact that Mother "called constantly, and appeared two to three times per week to submit to drug testing. . . ." Further, Mother asserts that the case manager had "inexplicable and extensive involvement in the prosecution of the criminal case[s]" against her. Mother points in particular to the case manager's appearance at her sentencing hearing for the assault on the Child, her contact with the prosecuting attorneys regarding Mother's pending cases in two counties, and her appearance at Mother's parole hearing for the assault conviction. Mother contends that such acts and omissions by DCS demonstrate that DCS was actively working against her and thereby denied her right to a fair and impartial hearing of this case.

Mother cites cases and statutes upholding the principle that a parent's right to the care and custody of her child is a fundamental one that is to be afforded the most stringent due process protections by the courts. She does not, however, point to any authority supporting her contention that the conduct by DCS of which she complains rises to the level of a due process violation. And we find none. Neither do we agree that the facts indicate that DCS's staff was biased against Mother. The evidence at the trial showed that when Mother was not incarcerated, DCS routinely administered drug screens and, other than one positive result in November 2006, Mother passed all of them. At the termination hearing, the DCS case manager testified that Mother was not given additional drug screens each time she voluntarily appeared at the DCS office and requested one because such screens would not be considered "random," all of which, according to DCS, was explained to Mother. In any event, it is evident that DCS acknowledged Mother's progress in this area – her May 23, 2007 revised permanency plan noted as a "new strength" that Mother had been sober for four and a half months and had passed all her drug screens. In light of such proof, it is difficult to understand Mother's argument that DCS somehow violated principles of due process by refusing to administer further, seemingly unnecessary drug screens.

Regarding Mother's criminal cases, the proof shows that the DCS case manager, in order to avoid being subpoenaed by the State, appeared voluntarily and testified at Mother's sentencing hearing on the assault conviction. In addition, she monitored Mother's other criminal cases and appeared at the parole hearing with respect to the assault conviction. Before the parole board, the case manager testified to the underlying facts of the case and provided a copy of the sentencing hearing transcript wherein the trial judge opined, in pronouncing sentence, that Mother received a "very good plea agreement" and needed "to

serve every day of this six year sentence." Mother suggests that had the case manager not testified, she likely would have been paroled and free to continue taking steps to regain custody of the Child. Mother's conclusion is sheer speculation. That aside, Mother offers nothing to support her position that the case manager's conduct amounted to a due process violation. Furthermore, we are unaware of any case authority under similar facts that support Mother's assertion.

V.

A.

Next, Mother challenges the finding that she was in substantial noncompliance with the permanency plan. Mother's argument is essentially two-fold: (1) because the initial plan and some of its revised forms were not ratified by the court in a timely manner, the plan was ineffectual and Mother was under no obligation to complete required actions within the prescribed time periods; and (2), timing aside, Mother substantially complied with the terms of the permanency plan and the court's finding to the contrary is error.

As relevant to our review, Tenn. Code Ann. § 36-1-113(g) provides as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

*   *   *

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4 ;

B.

First, Mother's contention that the failure to timely ratify the plan (or its revisions) rendered the plan "of no force and effect" is unavailing. As DCS correctly notes, we have previously rejected this same argument. *See In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003); *In re T.F.*, No. W2001-01935-COA-R3-JV, 2005 WL 2002 WL 1751221 (Tenn.

-6-

Ct. App. W.S., filed Feb. 19, 2002).  In holding that a court's untimely ratification does not nullify a permanency plan, we observed:

> Tenn. Code Ann. § 37-2-403 directs the juvenile court to ratify a permanency plan within sixty days if a child is placed in foster care. The court in this case did not meet that deadline, but as we have said in prior cases, these requirements are directory and not mandatory. The mother does not argue that she was unaware of the conditions placed on her or that she thought the plans had lapsed. She was at all pertinent times represented by counsel, and she did not object to the continuing applicability of the plans. Therefore, we do not think she can escape the conditions placed on her on this basis.

*In re A.W.*, 114 S.W.3d at 546.  (internal citation omitted).

In the present case, the initial permanency plan was created and signed by all relevant parties, including Mother, on September 14, 2006.  It was ratified by the juvenile court on November 27, 2006.  Subsequently, the plan was revised and the record reflects that some versions were not approved by the court within 60 days or were filed well after they took effect.  At the termination hearing, however, the DCS case manager testified that once a permanency plan is entered into, DCS begins to work toward its goals and will provide any assistance a parent may need to satisfy its requirements.  If the court subsequently orders revisions, they are incorporated and the plan continues in effect as approved by the court. In the present case, as in *In re A.W.*, Mother does not dispute that she was aware of the revised plans and her responsibilities.  At no point in her testimony at the termination hearing or even in her brief does Mother suggest otherwise.  To the contrary, she testified that she missed only one team meeting with DCS staff discussing the plan and her progress.  Mother's challenge to the validity of the plans is without merit.

C.

Substantively, Mother asserts that although she may not have completed her responsibilities within the target dates set out in the plan, she did ultimately complete them. DCS responds that while Mother had at one point completed many of the assigned tasks, her achievements were largely rendered meaningless when she incurred a new criminal charge that resulted in her being incarcerated and unable to maintain the progress she had made on key objectives of the plan.  In its termination order, the trial court found substantial noncompliance with the permanency plan based on Mother's answer to the petition as well as the proof presented at the hearing. We address the court's findings in turn.

The court began by noting the allegation stated in paragraph 34 of the termination petition: "The revised plans gave [Mother] certain dates to satisfy the requirements of the plans and she has failed to comply." In her answer, Mother "admitted" this allegation. As a result, at the start of the hearing, DCS moved for a judgment on the pleadings with respect to the ground of substantial noncompliance with the permanency plan. The trial court granted the motion on finding that "Mother was in Substantial Noncompliance with the Permanency Plan . . . based on Mother's answer to the Petition . . . admitting that she failed to comply with the Permanency Plans."

In our view, Mother's answer simply admitted that she did not fulfill all the requirements by the expected achievement dates provided in the plans. In this regard, we disagree with the trial court's finding that the ground of substantial noncompliance was established as a matter of law through Mother's answer to the petition. Our conclusion does not, however, lead us to conclude that there was reversible error as to this issue. We note that, despite granting judgment in favor of DCS regarding this ground, the trial court went on to take proof at the hearing regarding the extent of Mother's compliance with the plan. As we have noted, the trial court also found, by clear and convincing evidence, that the evidence established Mother's substantial noncompliance with the plan.

Mother signed the initial permanency plan on September 16, 2006. She agreed that she participated in the plan's development, and understood and agreed with its terms. Among the concerns at that time, the plan noted that Mother was a habitual drug user, was on pre-trial diversion for previous offenses, had no stable home and was unemployed. At the hearing, Mother conceded that despite the Child being removed from her custody and her awareness of what she had to do to get the Child back, she initially concentrated on getting cocaine to feed her continuing drug habit and failed to complete any of the plan's requirements by the initial due dates. Mother testified that "for the first four months after [the Child] was taken I didn't do much of anything. And yes, I was supposed to be working hard, but I wasn't during the first four months."

As we have noted, Mother was in jail on various charges for all but a few weeks between January and mid-April 2007. The proof shows that after her release, Mother began to make significant progress in meeting her responsibilities under the plan. Mother had obtained housing that she shared with a friend as of May 21, 2007. Around that same time, she was working at two different jobs. In addition, Mother had completed most of her anger management classes, remained drug-free, completed a psychiatric evaluation, and had been cooperative with DCS staff. By August 1, 2007, the plan noted that Mother was visiting the Child two hours a week, taking required parenting classes, had maintained housing and employment, and had completed an alcohol and drug assessment.

The dual goals of reunification and adoption remained in the November 7, 2007 permanency plan. Even before her August 2007 arrest, however, Mother's work toward reunification began to unravel. One job that was seasonal ended for the summer and she was fired from the other, according to Mother, after being accused of giving away a gift certificate to her employer's store. With her arrest on August 28, Mother lost her housing and the opportunity to obtain new employment. She never achieved the required four-consecutive months of stable housing or stable employment. Further, visitation with the Child ceased as the result of a no-contact order the court imposed following Mother's incarceration. In addition, Mother fell behind on child support payments. After parole was denied, Mother would be unable to address any of these deficiencies in the foreseeable future.

In summary, in the five months she was out of jail, Mother was able to complete or begin many of her responsibilities in the plan. Ultimately, however, her actions were not long-lasting and she failed to achieve the desired outcomes; in particular, Mother never became financially or residentially able to care for the Child and never became a law-abiding citizen. Moreover, her case manager testified that while Mother had completed an alcohol and drug assessment and a psychiatric evaluation, she never provided evidence that she had satisfied any of the recommendations of the assessment or the evaluation. In its order of termination, the trial court concluded its findings on this ground as follows:

> This Court specifically finds that the parental rights of [Mother] should be terminated on the ground[ ] that [ ] Mother was in Substantial Noncompliance with the Permanency Plan . . . , since she is in substantial noncompliance with the terms of the Permanency Plans as of the date of this termination hearing and further, that her current noncompliance is the result of her own actions, despite all of the reasonable efforts the Department has made to assist her and by Mother's own admission of non-compliance.

The evidence does not preponderate against the trial court's finding, by clear and convincing evidence, that Mother was in substantial noncompliance with the permanency plan at the time of the hearing. The trial court did not err in terminating Mother's parental rights on this ground.

At this juncture, we observe that the trial court relied on six grounds in support of its decision to terminate Mother's parental rights. As discussed, Mother has challenged only one ground - failure to comply substantially with the terms of the permanency plan. In its brief, DCS essentially concedes that the trial court's finding of abandonment by failure to

support and by failure to visit the Child were not sufficiently established to support these grounds for termination. The evidence with respect to the relevant time period shows that there was a no-contact order in place barring Mother's visitation with the Child for part of that time, but DCS concedes she "evidently visited regularly enough in her remaining weeks of freedom." Regarding the failure to support the Child, DCS states that there is "no evidence [Mother] failed to pay support during the same four-month period; if anything her testimony suggests otherwise." Assuming, without deciding, that DCS correctly concedes that this ground was not sufficiently established, we are left with four additional grounds – abandonment by failure to provide a suitable home for the Child; abandonment by conduct that exhibits a wanton disregard for the welfare of the Child; persistent conditions; and that the parent was sentenced to two or more years in prison for conduct against the Child that constitutes severe child abuse. *See* Tenn. Code Ann. §§ 36-1-102(1)(A)(ii)&(iv); 36-1-113(g)(3)(A); 36-1-113(g)(5). Although Mother has not contested the remaining grounds, this Court has reviewed the entire record. We conclude that the evidence does not preponderate against the trial court's finding that, in addition to substantial noncompliance with the permanency plan, each of the four remaining grounds was established by clear and convincing evidence. Even had Mother challenged these grounds she could not prevail. The evidence before us does not preponderate against the trial court's findings of fact in support of its termination order.

VI.

Lastly, we consider whether there was clear and convincing evidence to support the trial court's finding that termination of Mother's parental rights was in the best interest of the Child. To this end, we are guided by the non-exclusive list of factors provided in Tenn. Code Ann. § 36-1-113.[3]

---

[3]Tenn. Code Ann. § 36-1-113(i) provides as follows:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(continued...)

The trial court made extensive findings regarding its analysis of the best interest of the Child. In relevant part, the court found that Mother's parental rights should be terminated for the Child's sake as follows:

Mother has not made changes in her conduct or circumstances that would make it safe for the Child to go home. Mother is presently incarcerated at the Tennessee Prison for Women serving a six (6) year sentence for Failure to Protect the Child. Mother was denied release at her first parole hearing and will not be eligible for parole again until 2010.

Mother has not made lasting changes in her lifestyle or conduct after reasonable efforts by DCS, and a lasting change does not

[3](...continued)

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

appear possible now, especially in light of her current incarceration and the fact that Mother continued to incur additional criminal charges while the Child was in the custody of [DCS]. Further, the Child has been in DCS custody for twenty-five (25) months, and Mother has brought about no change whatsoever over this twenty-five (25) months span to cure the persistence of conditions that brought the Child into custody.

[T]here is no meaningful relationship between Mother and the Child. The Child has been in DCS custody for twenty-five (25) months, and Mother has only seen the Child for fourteen (14) hours during that time. Mother has not seen the Child at all since August 24, 2007, more than fourteen (14) months ago.

Mother . . . has not paid the full and complete amount of child support as previously ordered by the Court. Mother was in arrears on her child support by more than $1,000 at the time of the filing of the Termination of Parental Rights petition, and is unable to pay child support at this time due to her continuing incarceration.

[C]hanging caregivers at this stage of the [Child's] life would have a detrimental effect on [the Child]. The Child has no relationship with the Mother whatsoever at this time. The Child has bonded with her foster parents . . . and refers to them as "Mommy and Daddy." Mr. and Mrs. Beasley are ready, willing, and able to adopt the Child in the event parental rights are terminated to make her available for adoption.

Mother . . . has, for intents and purposes, abandoned her Child.

Mother . . . has shown little or [no] interest in the welfare of her Child. Rather than working to get her Child back, Mother continued to incur criminal charges during the time that the Child was in DCS custody. Mother is currently incarcerated . . . . Mother continued to test positive for drugs during the time that the Child was in DCS custody.

> [T]he Child has established a strong bond with her current relative placement, who wish to adopt her.

To Mother's credit, the evidence does appear to establish that she had ceased using drugs after she decided to begin working toward reunification in January 2007. This and other positive steps Mother took were certainly steps in the right direction. Unfortunately, her criminal behavior continued and she was unable to make the lasting adjustments necessary to regain custody of the Child. There is clear and convincing evidence that termination of Mother's parental rights is in the best interest of the Child.

## VII.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Candis D. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE